UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC. and AKAMAI SECURITIES CORPORATION,<br><br>    Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK AG,<br><br>    Defendant. | 10 Civ. ____<br><br>**Complaint** |

**COMPLAINT**

**Preliminary Statement**

1.   Akamai Technologies, Inc. and Akamai Securities Corporation (jointly, "Akamai") bring this Complaint against Deutsche Bank AG to recover $217 million that Deutsche Bank AG's wholly-owned subsidiary Deutsche Bank Securities, Inc. ("Deutsche Bank Securities") wrongfully invested in toxic auction-rate securities ("ARS").  (Deutsche Bank AG and Deutsche Bank Securities collectively are referred to herein as "Deutsche Bank.")  Deutsche Bank AG is liable for the wrongful conduct of Deutsche Bank Securities under Section 20(a) of the United States Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a, et seq., and M.G.L. c. 110A, sec. 410(b), because at all relevant times it had the ability to control Deutsche Bank Securities and it exercised that control.[1]

2.   Akamai instructed Deutsche Bank Securities, which served as Akamai's investment advisor and broker, to invest in safe and liquid securities because it needed ready access to the

---

[1] Deutsche Bank Securities is not a defendant in this action because Akamai's account agreement with Deutsche Bank Securities requires that any dispute with Deutsche Bank Securities be arbitrated before the Financial Institution Regulatory Authority.  The agreement does not cover Deutsche Bank AG.

1

money entrusted to Deutsche Bank Securities to fund its operations. Deutsche Bank Securities touted ARS to Akamai as fitting this profile. Specifically, Deutsche Bank Securities represented to Akamai that ARS were highly liquid investments that met Akamai's investment guidelines, and Deutsche Bank Securities further represented that no auction for these securities had ever failed.

3.  However, Deutsche Bank knew at the time that ARS were riskier than it represented to Akamai -- and that auctions had indeed failed. By no later than August 2007, Deutsche Bank also knew that the demand for ARS was diminishing and that investors in ARS therefore faced a serious risk that the auctions for ARS would fail -- and that customers' money would thereby be frozen. But Deutsche Bank did not reveal these risks to Akamai. Nor did Deutsche Bank disclose to Akamai that the liquidity of the ARS market was being artificially supported by Deutsche Bank and other financial institutions, which were secretly propping up the ARS market. As one means of covertly supporting the ARS market so that it would appear to investors to be safer than it actually was, Deutsche Bank and other financial institutions were party to or aware of secret side deals with ARS issuers to ensure that auctions did not fail due to lack of demand. In addition, through strategic and undisclosed bidding in ARS auctions, Deutsche Bank, as well as other financial institutions, sought to set artificially low rates for ARS in order to make the securities appear less risky and more liquid than they actually were. Deutsche Bank thereby perpetuated the illusion that the securities were fully liquid, even when it knew demand for ARS was waning. Customers like Akamai thus remained unaware of the increasing liquidity risk that ARS posed.

4.  By contrast, Deutsche Bank was well aware of these and other risks of owning ARS. Indeed, as a result of its concerns over the potential illiquidity of these securities, Deutsche

4608986v1

Bank undertook to reduce its own exposure to ARS in the fall of 2007. At the same time it was reducing its own exposure, it continued to tout ARS to Akamai as safe and liquid investments, and it more than doubled Akamai's ARS holdings.

5. In February 2008, the very risk that Deutsche Bank had concealed from Akamai materialized, and the market for the ARS held by Akamai collapsed. Akamai was left holding well over $200 million in illiquid securities that Deutsche Bank Securities had improperly funneled into its account.

6. The market collapse was a surprise to Akamai, but it was not unexpected to Deutsche Bank. It was the direct result of the decision by Deutsche Bank and other banks to protect their own interests over those of customers like Akamai. It was the abrupt -- and undisclosed -- choice by Deutsche Bank and other banks to stop propping up the ARS market in February 2008 that caused the securities in Akamai's account to freeze.

7. Deutsche Bank's misconduct toward its ARS customers has not gone unnoticed by regulators. Deutsche Bank has been the subject of multiple regulatory investigations and adverse findings regarding its improper ARS sales practices. Deutsche Bank has been investigated by, among others, the Securities and Exchange Commission ("SEC") and the North American Securities Administrators Association ("NASAA"), a group representing more than a dozen state attorneys general. As part of settlements in connection with these investigations, Deutsche Bank has had to agree to buy back -- at the full face value -- ARS from all of its individual retail clients and smaller institutional players, and pay a $15 million fine. The settlements also require Deutsche Bank to provide liquidity solutions to institutional investors like Akamai, which Deutsche Bank has failed to do.

4608986v1

8.  Despite compelling evidence of Deutsche Bank's violation of state and federal law resulting from its failure to meet its obligations to Akamai, Deutsche Bank has refused to make Akamai whole. Deutsche Bank has yet to provide Akamai with any redress for the impairment and illiquidity of the ARS in Akamai's account, which remain frozen.

## The Parties

9.  Plaintiff Akamai Technologies, Inc. is a Delaware corporation with its principal place of business at 8 Cambridge Center, Cambridge, MA 02142. Akamai Technologies, Inc. is a technology company devoted to improving the speed and efficiency of the Internet, as well as to providing digital content to users worldwide. The company handles billions of interactions on the Internet each day. Plaintiff Akamai Securities Corporation is a Massachusetts corporation that is 100% owned by Akamai Technologies, Inc, and which operates as a Securities Corporation under Section 38B of Chapter 63 of the M.G.L. Its sole purpose is to hold and invest capital contributions made to it by Akamai Technologies, Inc.

10. Defendant Deutsche Bank AG is a major global banking institution based in Frankfurt am Main, Germany. It is the sole and complete owner of Deutsche Bank Securities, a Delaware corporation and a broker-dealer registered with the SEC. Deutsche Bank Securities' principal place of business is New York, New York and it has offices in Boston, Massachusetts.

**Factual Background**

I. *Akamai's Investment Mandate with Deutsche Bank Securities*

11.     Akamai is a conservative investor. As a rapidly growing technology company, it relies on its cash reserves to fund its operations and to finance its expansion. Consequently, it does not seek high rates of return in risky investments, but rather safe, short term investments that will enable it to access its cash when needed. Akamai's investment guidelines make the company's priorities clear: "The primary objective is to preserve principal and maintain liquidity." Although ARS are listed among the permissible investments, they are permitted only insofar as they remain consistent with the overall investment objectives of safety and liquidity.

12.     Deutsche Bank was well aware of Akamai's investment objectives, as well as the reasons the company needed to ensure that its cash reserves did not become illiquid. Further, Deutsche Bank Securities was intimately aware of Akamai's business model: Deutsche Bank's cash management relationship with Akamai dated back to the fall of 2005, when Akamai was planning a secondary offering of its securities. Deutsche Bank Securities served as the underwriter for this offering. In addition, the investment management group at Deutsche Bank Securities pitched its cash management services to Akamai at Akamai's office in Cambridge, Massachusetts, as a means of managing the proceeds from the offering. Deutsche Bank Securities touted its experience managing the cash of corporate investors and presented itself as an expert in this field.

13.     Because it does not have significant investment expertise or a sophisticated treasury operation, Akamai was interested in Deutsche Bank Securities' claimed expertise as a cash management advisor. Relying on Deutsche Bank Securities' representations, Akamai opened

a discretionary account with Deutsche Bank Securities in November 2005 and deposited approximately $100 million in proceeds from its secondary offering. From the time the account was opened until February 2008, Akamai continued to invest additional operating profits with Deutsche Bank Securities, and the balance in the account frequently exceeded $200 million.

14. Deutsche Bank Securities' discretion in managing the account was limited by Akamai's corporate investment guidelines, which Akamai provided to Deutsche Bank Securities. Akamai instructed Deutsche Bank Securities not to make investments inconsistent with those policies, and Deutsche Bank Securities agreed.

## II. *The ARS Market and Deutsche Bank's role therein*

15. Auction rate securities typically are comprised of long-term debt obligations, often with maturity dates of 30 years or more. There are several broad categories of ARS, each backed by a different type of collateral, and each with its own benefits and risks. The underlying collateral for the ARS purchased by Deutsche Bank Securities for Akamai's account consisted entirely of student loans.

16. The interest rate for an ARS is set at a "Dutch auction" typically held every 7, 14, 28, or 35 days. If successful, the ARS auctions enable issuers to access long-term debt at short-term rates.

17. At an auction, prospective buyers submit bids to an auction agent. Each bid consists of the par value of the securities that the buyer wishes to purchase and the minimum interest rate that the buyer is willing to accept. At a successful auction, ARS trade at par.

18. Each ARS has a maximum interest rate that the issuer is contractually obligated to pay to the holder of the security. Bids in an auction must be at or below the maximum interest

rate in order to be accepted. On the day of the auction, the auction agent collects all of the bids and determines whether there are sufficient bids below the maximum rate to cover all of the outstanding securities. If there is sufficient demand, the auction agent deems the auction successful and sets the interest rate for all of the securities at the lowest interest rate necessary to result in the sale of all the securities (this is called the "clearing rate"). If there are insufficient bids below the maximum rate to cover all securities offered, the auction agent is suppose to declare a "failed auction."

19. When an auction fails (i.e., there are insufficient bids to cover all of the outstanding securities), the current holders must continue to hold their ARS investments until the next auction. If auctions continue to fail, holders may have to hold their ARS investments until the underlying securities mature, which could be decades later.

20. When an auction fails, the interest rate cannot be set through the auction process, and the auction agent sets the rate at a level specified in the offering documentation for the particular ARS. This interest rate is known as the "default rate."

21. In the case of many ARS, the default rate is significantly higher than the prevailing interest rate. High default rates are designed to promote successful auctions by making failed auctions financially unattractive to issuers of ARS, and to encourage those issuers to redeem failed ARS rather than pay the penalty rate. This mechanism provides a purchaser with a type of built-in insurance, as well as additional compensation in the event of a failed auction. However, the default rate for ARS backed by student loans ("student loan securities") is often far below the rate set on other types of ARS. The interest on student loan securities is paid from the proceeds of the student loans themselves; thus, the interest paid to holders of student

loan securities generally cannot, in the long term, exceed the interest rates on the underlying loans.

22. As a consequence, holders of student loan securities, such as Akamai, have suffered both the loss of liquidity and a reduced return on their now illiquid holdings. For instance, since the widespread failure of auctions in February 2008, the majority of ARS backed by municipal debt have been redeemed, thereby providing liquidity and principal to the holders of the bonds. By contrast, very few student loan securities have been redeemed because issuers pay below market interest on those securities and have no incentive to redeem them. Thus, the holders of such securities, such as Akamai, have suffered greater economic harm as a result of the auction failures than holders of ARS backed by other collateral.

23. Deutsche Bank Securities acted as an underwriter, lead manager, trustee, and auction agent on numerous ARS issues, including those backed by student loans. As an underwriter, Deutsche Bank Securities was responsible for marketing and selling the securities to investors. As lead manager, Deutsche Bank Securities was the primary party responsible for collecting and submitting bids on behalf of those wishing to bid in an auction. As the trustee, Deutsche Bank Securities was responsible for gathering and disseminating investment information to security holders. Finally, as the auction agent, Deutsche Bank Securities was responsible for running auctions and calculating the appropriate interest rate. As an auction agent, Deutsche Bank Securities acted on behalf of more than 400 issuers with 2,200 outstanding issues totaling over $115 billion. Deutsche Bank earned significant fees in all of these roles.

III. *Deutsche Bank's Misrepresentations and Omissions*

24.     Throughout the time that Deutsche Bank Securities was purchasing ARS for Akamai's account, Deutsche Bank Securities misrepresented the nature and risks of these securities to Akamai.  It did so both through repeated affirmative false statements and by concealing key information about the securities from Akamai.

25.     Deutsche Bank Securities knew that liquidity was important to Akamai, as reflected in its extremely conservative investment policy.  Deutsche Bank Securities consistently reported to Akamai that it was complying with the company's investment policies and instructions when it was not.  Deutsche Bank Securities falsely represented to Akamai that ARS were highly liquid, short term investments.

26.     Deutsche Bank Securities knew, but did not disclose to Akamai, that ARS had a significant but undisclosed risk of illiquidity and should not have been considered short term investments.  On account summaries sent to Akamai every month, Deutsche Bank Securities misrepresented that the ARS it purchased for Akamai had maturities of less than 90 days.  This was false.  As Deutsche Bank well knew, the true maturities of the ARS purchased for Akamai's account varied from approximately ten to more than thirty years and made them unsuitable for Akamai.

27.     Further, in violation of its internal compliance rules and regulatory requirements, Deutsche Bank Securities failed to provide any prospectuses or risk disclosures to Akamai for the ARS Deutsche Bank Securities was purchasing for Akamai.  Deutsche Bank Securities knew that such information would have risked leading Akamai to withdraw its money from the ARS market.  This was not the first time that Deutsche Bank Securities systematically failed to supervise its employees and maintain appropriate procedures.  For example, in

September 2007, the New York Stock Exchange censured and fined Deutsche Bank Securities for violating a number of NYSE Rules, including Rule 342, in connection with Deutsche Bank Securities' failure to provide prospectuses to customers. (The NYSE Enforcement Order is attached hereto as Exhibit A.)

28.  Deutsche Bank's misrepresentations and omissions in the six months immediately prior to the widespread auction failures in February 2008 were particularly egregious. In August 2007, several dozen ARS auctions failed, many of which were underwritten or managed by Deutsche Bank Securities. Although the auction failures in August 2007 were not of student loan securities, the problems that caused the failures were common to ARS generally, as Deutsche Bank realized. Indeed, in response to the August 2007 auction failures, Deutsche Bank Securities decided to cancel a planned underwriting of a new student loan security, even though no student loan securities had yet failed at auction. Deutsche Bank Securities understood that the disruptions in one part of the ARS market could (and already had) spread to other sectors, including student loan securities. Deutsche Bank did not, however, inform Akamai of the failed auctions, the increased risk of failures for other ARS, or its cancellation of the underwriting.

29.  Deutsche Bank also understood that between August 2007 and January 2008 demand for ARS was declining. For instance, Deutsche Bank could track its own inventory as a measure of the supply and demand for ARS, whereas customers like Akamai had no access to comparable information. Similarly, Deutsche Bank was aware that the difference between ARS interest rates and the maximum rates was decreasing, a strong indicator of increased risk, decreased liquidity, and increased potential for auction failures. Deutsche Bank, well aware of these facts, made the decision to reduce its own exposure to this market. Fewer

4608986v1

investors meant fewer bids and increased risk of auction failures market-wide.  It also meant that Deutsche Bank and other institutions would have to play an ever greater role in propping up the auctions if they were to continue.  Yet, in violation of its duties to Akamai, Deutsche Bank Securities did not disclose these risks and instead continued to misrepresent ARS as safe and liquid, because revealing the truth to Akamai and other customers would have undermined Deutsche Bank's own financial interests.

30.     Deutsche Bank and other banks thus hid risks from customers, using inside information surreptitiously to place their own proprietary bids in a large number of auctions that could have failed without their involvement.  By placing bids in auctions, Deutsche Bank was able to create the false appearance of liquidity and stability.  Deutsche Bank Securities did not disclose this information to Akamai; Deutsche Bank Securities did not sell Akamai's ARS or recommend that it do so; Deutsche Bank Securities instead continued to purchase ARS on behalf of clients, including Akamai.

31.     During the same period, on information and belief, Deutsche Bank was aware of and participated in waivers of the maximum interest rates on ARS.  These waivers clearly confirmed to Deutsche Bank that the demand for ARS was declining dramatically.  Indeed, the purpose of the waivers was to disguise the flagging demand by permitting auctions to clear at higher rates, thus preventing (at least temporarily) the failures that were otherwise expected in the marketplace.  At the same time, these waivers enabled Deutsche Bank to promote to its customers the relatively high returns being generated by ARS and to justify increasing their customers' ARS positions while at the same time Deutsche Bank was decreasing its own ARS exposure.  Between September 2007 and February 2008, waivers of

4608986v1

maximum interest rates were obtained for a large number of ARS.  Deutsche Bank never informed Akamai of this practice, nor the risks it concealed.

32. Because of its secret attempts, along with other banks, artificially to prop up the auction market, Deutsche Bank Securities' proprietary inventory of ARS began to rise dramatically.  Indeed, between August 2007 and December 2007 Deutsche Bank Securities' proprietary ARS holdings increased from approximately $100 million to approximately $325 million.

33. As a result of its increased holdings and the risks concerning the liquidity and safety of ARS, in the fall of 2007 Deutsche Bank Securities ordered its traders to sell Deutsche Bank Securities' own ARS, even if they could only do so at a significant discount, in order to reduce Deutsche Bank's exposure to the deteriorating securities.

34. Despite having concluded that ARS were unsuitable for its own account, Deutsche Bank Securities accelerated its purchases of ARS on behalf of its customers, including Akamai, without ever disclosing any of these risks.  Indeed, Deutsche Bank Securities dumped an ever increasing amount of ARS into the Akamai account at the same time Deutsche Bank was seeking to get rid of its own inventory.  Beginning in the summer of 2007 -- the same time that, unbeknownst to Akamai, ARS auctions had begun to fail -- Deutsche Bank Securities' investments in ARS for Akamai began to skyrocket.  Between July 2007 and February 2008, Deutsche Bank Securities more than doubled Akamai's investments in ARS.  In fact, whereas in July 2007, ARS represented just 43% of Akamai's holdings, by February 2008, over 84% of Akamai's portfolio had been invested by Deutsche Bank Securities in ARS.

4608986v1

35. In January 2008 -- just weeks before the ARS would freeze as a result of the risks known to Deutsche Bank but not Akamai -- Akamai inquired of Deutsche Bank Securities about the possibility of market illiquidity. Instead of candidly revealing the risks it knew well, Deutsche Bank Securities falsely assured Akamai that not a single ARS had ever failed at auction. Deutsche Bank Securities made this statement with full knowledge that more than a dozen of its own securities had failed at auction less than six months earlier, and hundreds more could have failed if not for the artificial and hidden support of Deutsche Bank and other financial institutions.

36. On or about February 13, 2008, Deutsche Bank determined that it could no longer afford to maintain the charade of safety and liquidity it had perpetuated since August 2007. On that date, Deutsche Bank and other financial institutions that had been propping up the ARS market simultaneously stopped submitting proprietary bids in auctions, and as a result the ARS in Akamai's account became illiquid and have remained illiquid ever since.

37. After all of the ARS in Akamai's account became illiquid in February 2008, Akamai spoke with Deutsche Bank Securities about the consequences of the auction failures. In violation of regulations, Deutsche Bank Securities was unable to provide details of the particular securities that it had purchased on Akamai's behalf. As Akamai's fiduciary, Deutsche Bank Securities had an obligation to understand the characteristics and terms of each product that it purchased for Akamai. Nevertheless, Deutsche Bank Securities had not reviewed basic documents related to the securities, such as prospectuses, and Deutsche Bank Securities lacked critical information about the securities, such as their long-term interest rates and the security of the underlying collateral.

38.     Two years later, the ARS market is still frozen and industry experts predict that it will not return.

IV.     *Deutsche Bank AG's Control of and Failure to Supervise Deutsche Bank Securities and Deutsche Bank Securities' Client Advisors*

39.     At all times relevant to this action, Deutsche Bank AG exercised control over Deutsche Bank Securities, as Deutsche Bank AG itself has admitted. In its 2008 Form 20-F, filed with the SEC, Deutsche Bank AG stated: "We also control U.S. banking subsidiaries, including Deutsche Bank Trust Company Americas ("DBTA"), and U.S. broker-dealers, such as Deutsche Bank Securities Inc." (Emphasis supplied.) Deutsche Bank AG thus had access to -- and the ability to prevent -- the false and misleading statements made by Deutsche Bank Securities regarding ARS.

40.     Furthermore, Deutsche Bank Securities is a wholly owned subsidiary of Deutsche Bank AG, and Deutsche Bank AG incorporates the financial results of Deutsche Bank Securities directly into its financial statements. In its SEC filings, Deutsche Bank AG uses the terms "we," "us," and "our" to refer to Deutsche Bank AG "and its consolidated subsidiaries," including Deutsche Bank Securities. Thus, in describing the size and scope of its operations, Deutsche Bank AG describes itself in a way that encompasses its subsidiaries: "[W]e are the largest bank in Germany, and one of the largest financial institutions in Europe and the world. … As of [December 31, 2008], we employed 80,456 people on a full-time equivalent basis and operated in 72 countries out of 1,981 branches worldwide."

41.     In its public filings, Deutsche Bank AG presents itself as a "global investment bank" and touts the fact that its "brand is synonymous with strength and quality throughout the world, and our logo" -- under which Deutsche Bank Securities operates in the United States -- "is one of the best-recognized brand symbols in the global financial industry." Deutsche

14

Bank AG also describes New York City, the headquarters of Deutsche Bank Securities, as one of its "regional major hubs." Consistent with this approach of marketing itself as a single worldwide entity, Deutsche Bank has stated in press releases that Deutsche Bank Securities "is the investment banking and securities arm of Deutsche Bank AG in the United States."

42.  Deutsche Bank AG has also exercised its control of Deutsche Bank Securities in the context of ARS. Thus, it was Deutsche Bank AG, rather than Deutsche Bank Securities, that entered into a settlement term sheet with the NASAA, even though the term sheet concerned settlements with Deutsche Bank Securities. In describing the ARS regulatory settlements in its 2008 20-F, Deutsche Bank AG did not differentiate itself from Deutsche Bank Securities. Instead, it wrote that, "Deutsche Bank entered into agreements in principle" with regulators, "pursuant to which <u>Deutsche Bank and its subsidiaries</u> agreed to purchase from their retail, smaller and medium-sized institutional, and charitable clients, ARS those clients purchased from Deutsche Bank and its subsidiaries." (Emphasis supplied.)

43.  On information and belief, Deutsche Bank AG was responsible for ensuring the compliance of its employees -- including those at its subsidiaries -- with legal and ethical obligations. Indeed, Deutsche Bank AG promulgated a code of conduct that, by its own terms, applied to the conduct of all staff in all of its companies. As the code itself stated, "Belonging to Deutsche Bank Group and sharing its identity, means adhering unreservedly to this Code of Conduct." However, Deutsche Bank AG did not follow through on its obligation to supervise Deutsche Bank Securities and its employees to ensure that they were carrying out their responsibilities to Deutsche Bank's customers.

(a) Deutsche Bank Securities did not provide its agents with adequate training or information concerning the risks and characteristics of ARS. Indeed, according to

15

4608986v1

the SEC, there was no consistent understanding of which department -- if any -- was responsible for providing ARS training to client advisors who were selling those products. As a result, client advisors often did not understand the mechanics of the auctions, nor were they aware that banks, including Deutsche Bank Securities, were placing support bids. Thus these client advisors could not have provided complete information to their customers about the risks of ARS even if they had wanted to do so.

(b) Likewise, according to the SEC, Deutsche Bank Securities failed to implement consistent policies and procedures regarding client advisors' obligation to ensure that ARS were suitable for particular investors. For instance, the manual that governed the Fixed Income Desk -- the department to which client advisors were instructed to direct any questions about ARS -- categorized ARS as possible "non-conventional investments," which carried with them "comparatively greater risk than conventional products." In light of the riskiness of such products, the manual required client advisors to be "knowledgeable as to the features, risks, rewards, and all other factors relevant to making suitability determinations and necessary to facilitate complete, accurate, fair and balanced marketing and sales presentations." Remarkably, the manual that governed the activities of the client advisors themselves did not categorize ARS as a non-conventional investment and thus did not impose on Deutsche Bank Securities' sales force the heightened obligations regarding due diligence, suitability, and disclosure of the risks of ARS.

4608986v1

**FIRST CAUSE OF ACTION**
(Violation of Section 20(a) of the United States Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a, et seq.)

44.    Plaintiffs reallege paragraphs 1- 43 hereof with the same force and effect as if here set forth at length.

45.    Through the use of instrumentalities of interstate commerce, Deutsche Bank Securities violated section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5, by knowingly, intentionally and recklessly engaging in deceptive practices and making untrue statements and omissions of material facts in connection with the purchase of securities. Akamai reasonably relied on Deutsche Bank Securities' untrue statements and omissions, which have caused Akamai significant financial harm.

46.    Deutsche Bank AG is liable for the damage caused to Akamai by this fraud.  Deutsche Bank AG is a "controlling person" of Deutsche Bank Securities within the meaning of Section 20(a) of the United States Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a, et seq.  Deutsche Bank AG is therefore liable for the damage caused to Akamai by the fraud.

47.    Deutsche Bank AG participated culpably in the fraudulent scheme by actively furthering, recklessly failing to prevent, and profiting from the fraud.

48.    By reason of the foregoing, Akamai is entitled to be put in the position it would have occupied if Deutsche Bank had not violated Akamai's mandate, to wit: an order directing Deutsche Bank AG to remit to Akamai the full par value, plus accrued interest, of the ARS in its account with Deutsche Bank Securities.

## SECOND CAUSE OF ACTION
(Violation of M.G.L. c. 110A, sec. 410(b))

49. Plaintiffs reallege paragraphs 1- 43 hereof with the same force and effect as if here set forth at length.

50. Deutsche Bank Securities committed an intentional and reckless violation of Section 410(a) of M.G.L. c. 110A. by engaging in deceptive practices, making untrue statements of material fact, and misleadingly omitting material facts in connection with the purchase of securities.

51. Deutsche Bank AG is liable for the damage caused to Akamai by this fraud. Deutsche Bank AG "directly or indirectly controls" Deutsche Bank Securities within the meaning of Section 410(b) of M.G.L. c. 110A. Deutsche Bank AG is therefore liable for the fraud and statutory violation of its subsidiary Deutsche Bank Securities.

52. Deutsche Bank AG participated culpably in the fraudulent scheme by actively furthering, recklessly failing to prevent, and profiting from the fraud.

53. By reason of the foregoing, Akamai is entitled to be put in the position it would have occupied if Deutsche Bank had not violated Akamai's mandate, to wit: an order directing Deutsche Bank AG to remit to Akamai: (a) the full par value, plus accrued interest, of the ARS in its account with Deutsche Bank; (b) statutory interest at the rate of 6% from the date of Akamai's ARS purchases; and (c) the costs and attorneys' fees incurred by Akamai in connection with bringing this action.

WHEREFORE, Akamai respectfully request that the Court enter a judgment in their favor as follows:

1. For an order directing Deutsche Bank AG to provide Akamai with relief equivalent to rescission of the unauthorized transactions, to wit: an order directing Deutsche Bank AG to remit to Akamai the full par value, plus accrued interest, of the securities in its account with Deutsche Bank Securities.

2. For statutory interest at the rate of 6% from the date of Akamai's ARS purchases.

3. For the costs and attorneys' fees incurred by Akamai in connection with bringing this action.

4. For an order referring Deutsche Bank AG to the appropriate regulatory and criminal authorities for its fraudulent conduct.

5. For such other and further relief as the Court may consider just and proper in the circumstances.

Plaintiff's demand a trial by jury for all claims so triable.

DATED: February 12, 2010

Of Counsel:
Andrew Weissmann
Matthew W. Alsdorf
JENNER & BLOCK LLP
919 Third Avenue, 37th floor
New York, NY 10022
Tel: (212) 891-1650

Respectfully submitted,

BY: /s/ Michael T. Gass
Michael T. Gass
Jennifer E. Tracy
Ashley Tessier
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel: (617) 248-5000

*Attorneys for plaintiffs Akamai Technologies, Inc. and Akamai Securities Corporation*

4608986v1