UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC. and AKAMAI SECURITIES CORPORATION, ))) | |
| Plaintiffs, )) | Civil Action No: 10-CV-10254-JLT |
| v. )) | |
| DEUTSCHE BANK AG, )) | |
| Defendant. )) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SPECIFIC DISCOVERY TO PRESERVE EVIDENCE AND PREVENT UNDUE PREJUDICE

Plaintiffs Akamai Technologies, Inc. and Akamai Securities Corporation (collectively, "Akamai") respectfully move this Court to lift the automatic stay imposed by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), to allow Akamai to seek particularized discovery from Deutsche Bank AG ("DB AG") and to issue document preservation subpoenas to third parties.

## PRELIMINARY STATEMENT

When the auction rate securities ("ARS") market collapsed in February 2008, Akamai lost access to $217 million that DB AG and its wholly owned subsidiary, Deutsche Bank Securities, Inc. ("DBSI"), wrongfully invested in ARS on Akamai's behalf.  In response to Akamai's efforts, DB AG has pursued a strategy of concerted delay of this action such that over seven months after this lawsuit was filed, Akamai has still not obtained any discovery whatsoever.

DB AG and DBSI's seriatim attempts to delay this action include:

- When the ARS market froze in 2008, DBSI obstructed Akamai's attempt to learn about and address the illiquidity of its ARS portfolio.

- After the Securities and Exchange Commission ("SEC") and settlements by state attorneys general required DBSI to provide liquidity solutions to Akamai and other similarly situated investors, DB AG and DBSI did not meet those obligations, but instead engaged in obstruction and delay.

- DB AG refused to sign a tolling agreement with Akamai, thus forcing Akamai to file this action. DB AG and DBSI then retaliated by withdrawing the tolling agreement that Akamai had entered into with DBSI forcing Akamai to bring an arbitration against DBSI.

- In spite of these actions, DB AG then tried to persuade this Court that it was appropriate to stay this action pending the later-filed arbitration. The Court denied the stay motion. (Order dated Aug. 5, 2010 (Dkt. No. 19).)

Defendant's motion to dismiss, filed more than seven months after this case was commenced and without any discovery being undertaken to date, is just the latest maneuver in DB AG and DBSI's ongoing strategy to delay adjudication of Akamai's claims. DB AG should not be permitted to deprive Akamai of its right to litigate its federal claim against DB AG in federal court, including a right to federal court discovery, the right to oversight of an Article III judge, and the right to a jury trial.

Having lost its motion for a stay in August 2010, DB AG filed a motion to dismiss Akamai's Complaint in this action on September 13, 2010, this time triggering the automatic discovery stay provision provided by the PSLRA and therefore once again delaying Akamai's ability to pursue its claims. *See* 15 U.S.C. § 78u-4(b)(3)(B). Akamai has responded to that meritless motion in a separately filed opposition and will not repeat its arguments here. Regardless of the merits of that motion, however, this Court should not allow DB AG to hide behind a discovery stay during the pendency of its motion to dismiss. This is not the type of case that Congress intended to discourage with the PSLRA, and the circumstances of the case qualify

for the exception to the stay carved out by statute. Specifically, lifting the stay to permit particularized discovery is necessary to preserve evidence and prevent continuing and undue prejudice to Akamai from the delay Akamai has suffered by DB AG's litigation tactics. The Court should also lift the stay to prevent the risk that DB AG will continue to interpret its obligations – including those to preserve evidence under the PSLRA – unduly narrowly.

The discovery Akamai seeks at this time from DB AG are only those documents that DB AG has already produced to the SEC and to state attorneys general in connection with their settlements of ARS claims. As other courts have routinely found in similar circumstances, including ARS cases, Congress's intent in enacting the PSLRA is not frustrated by declining to enforce a stay for this particularized form of discovery. The production of such documents that DB AG has already produced to the SEC and attorneys general will impose no meaningful burden on it. And, the equities favoring production weigh strongly in favor of Akamai. Akamai itself was intended to be a beneficiary of the Consent Judgment that resulted from the SEC investigation in which DB AG produced the requested documents (a decree as to which DB AG and DBSI have thus far failed to abide). With regard to third parties, Akamai seeks only leave to issue subpoenas requiring third parties (who are not subject to the PSLRA's preservation requirements) to preserve – rather than produce – relevant documents. Such relief, which maintains the status quo, is widely authorized by courts.

For the reasons stated herein, the Court should lift the PSLRA's automatic stay with respect to particular documents that DB AG has already produced to the SEC and state attorneys general and permit Akamai to issue preservation subpoenas to third parties. In the alternative, Akamai respectfully requests that this Court deny the motion to dismiss, if possible to expedite the matter by an Order with opinion to follow, so that discovery that has so far been delayed for

seven months, can proceed.

## FACTUAL BACKGROUND

### A.    DBSI's Fraud Against Akamai

Akamai brought this action against DB AG to recover the more than $217 million that its wholly owned subsidiary, DBSI, wrongfully invested in toxic ARS on Akamai's behalf. (Compl. ¶ 1.)   DB AG is a major global banking institution headquartered in Frankfurt, Germany.  (*Id.* ¶ 10.)  DBSI, a wholly-owned subsidiary of DB AG, is a Delaware corporation based in New York and with a Boston office.  (*Id.*)  In the fall of 2005, Akamai engaged DBSI to provide cash management services in conformity with Akamai's investment objectives and guidelines requiring DBSI "to preserve principal and maintain liquidity."  (*Id.* ¶¶ 11-14, 25.)

DBSI failed to follow Akamai's investment guidelines.  Instead, after misrepresenting the nature of ARS and the liquidity of the ARS market to Akamai, DBSI bought toxic ARS for Akamai's investment account.[1]  (*Id.* ¶¶ 24-27.)   Specifically, in the critical period between August 2007 and February 2008, DBSI was aware of numerous strong indicators of decreased liquidity and heightening risk of ARS market failure, including the failure of ARS auctions, the rapid decline of investor demand shown on its internal tracking systems, and the decreased spread between ARS interest rates and maximum rates – all strong signs of waning liquidity.  (*Id.* ¶¶ 28-34.)   DBSI failed to disclose this material information to Akamai, but instead lulled Akamai into believing there was nothing to worry about.  (*Id.* ¶¶ 28, 32-35.)

After the first ARS auctions failed in August 2007, DBSI actually accelerated its purchases of ARS for Akamai's account, nearly doubling Akamai's investment in ARS from 43% to over 84% of its holdings – at the same time as it reduced its own exposure to ARS.  (*Id.*

---

[1] For background on ARS or the ARS market, please refer to paragraphs 15-23 of the Complaint and pages 2-7 of Akamai's memorandum in opposition to DB AG's motion to dismiss.

¶¶ 32-35.)  Myriad indicators of fraud between August 2007 and February 2008 exist, as noted in the Complaint, but none were disclosed to Akamai.  On February 13, 2008, the fraud culminated in DBSI and other financial institutions ceasing artificial support of the ARS auctions, causing the ARS market to fail, as they knew it would.  (*Id.* ¶ 36.)  As a result, Akamai lost access to $217 million fraudulently invested by DBSI.  (*Id.*)

**B.**     **The SEC's Investigation of DBSI and Entry of a Consent Judgment By Which DB AG and DBSI Have Failed to Abide**

The SEC investigated DBSI's conduct in purchasing ARS for its customers.  After that investigation concluded, the SEC filed a complaint alleging that DBSI "misled its customers about the fundamental nature and increasing risks associated with . . . ARS" and "failed to disclose to customers that DBSI placed supporting bids in ARS auctions to cover any potential shortfall of buyers and that, without such support, the auctions could fail, thereby rendering the customers' holdings illiquid." (SEC Complaint ¶¶ 1-3 (Gass Aff., Ex. A).) [2]  In June 2009, DBSI entered into a Consent Judgment with the SEC filed in the U.S. District Court for the Southern District of New York.  (SEC Consent Judgment (Gass Aff., Ex. B).) [3]  In that Consent Judgment, DBSI agreed to buy back the ARS it had purchased on behalf of individuals, foundations, and "small to medium-sized businesses . . . that had $10 million or less in assets in their accounts with Deutsche Bank AG," – *i.e.*, companies similarly situated to Akamai except with respect to their assets at DB AG.  (Ex. B at ¶ 3.)  For larger "institutional investors" such as Akamai, DBSI agreed to "use its best efforts to provide, by December 31, 2009, liquidity solutions" by "offer[ing] opportunities . . . to liquidate ARS Eligible ARS." (*Id.* at ¶ 6.)  DB AG also entered

---

[2]  Exhibits A-I are attached to the Affidavit of Michael T. Gass ("Gass Aff."), submitted contemporaneously herewith.

[3]  The Court can take judicial notice of judgments entered in other proceedings. *See E.I. Du Pont De Nemours & Co., Inc. v. Cullen*, 791 F.2d 5, 7 (1st Cir. 1986) (federal courts may take judicial notice of proceedings in other courts which relate to the matters at issue).

into a "Settlement Term Sheet" with the North American Securities Administration Association that "recommended to state attorneys general the settlement terms intended to resolve the investigation into the marketing and sale of auction rate securities by DBSI." (Gass Aff., Ex. C, at 1.) The terms of those settlement agreements require DBSI to "endeavor . . . to expeditiously provide liquidity solutions" for investors such as Akamai. *See, e.g.*, Apr. 16, 2010 Consent Order with the Commonwealth of Virginia. (Gass Aff., Ex. C, at 11.)[4]

DBSI has failed to abide by these requirements. Between the crash of the ARS market in February of 2008 and December 31, 2009, Akamai repeatedly attempted to engage DBSI in discussions to provide Akamai with a liquidity solution. DBSI consistently avoided and delayed any such discussions, refusing to work in good faith toward a liquidity solution for Akamai, necessitating this action.

## C.    Akamai's Claims Against DB AG

Akamai's federal claims against DB AG are based on the fact that DB AG's control of DBSI renders it liable to Akamai as a "control person" under Section 20(a) of the Securities Exchange Act of 1934 and its Massachusetts analog, M.G.L. c. 110A, § 410(b).  As detailed in the Complaint, DB AG has itself admitted exercising substantial control over DBSI and other subsidiaries operating in the United States, stating explicitly "[w]e also control U.S. banking subsidiaries, including . . . U.S. broker-dealers, such as Deutsche Bank Securities Inc." (Compl. ¶ 39 (quoting DB AG's 2008 Form 20-F, filed with the SEC)).  In fact, when describing the ARS

---

[4] The state attorneys general consent orders include conclusions of law that:  DBSI misrepresented ARS to clients, failed to "adequately disclose to clients the effect of the firm's role as underwriter and broker-dealer for ARS issues," used "supporting bids to artificially prevent failed ARS auctions," and failed to "adequately disclose the practice to clients;" and also that DBSI failed to: (i) provide "adequate training to agents concerning ARS," (ii) "create and maintain adequate written supervisory procedures concerning ARS," (iii) "ensure accurate disclosure of ARS characteristics to clients by its agents," and (iv) "ensure adequate disclosure of conflicts of interest concerning ARA to clients by its agents." *See, e.g.*, Apr. 16, 2010 Consent Order with the Commonwealth of Virginia. (Gass Aff., Ex. C, at 7-8).  Copies of settlements with other states are attached to Gass Aff., Exs. G, H, and I.

settlements with the SEC, including the Consent Judgment described above in its 2008 20-F filing with the SEC, DB AG did not differentiate itself from DBSI, instead disclosing that "Deutsche Bank entered into agreements in principle" with regulators, pursuant to which "Deutsche Bank and its subsidiaries agreed to purchase from their retail, smaller and medium-sized institutional, and charitable clients ARS those clients purchased from Deutsche Bank and its subsidiaries." (*Id.* ¶ 42; *see also* Gass Aff., Ex. C ¶ 4.)[5]

### D.     DB AG's and DBSI's Seriatim Attempts to Derail and Delay Resolution of Akamai's Claims

As Akamai detailed in its opposition to DB AG's unsuccessful motion to stay this action, Akamai tried for months to reach a negotiated solution with DBSI consistent with its obligations under the Consent Judgment. Facing the possibility that some of its claims would be time-barred, Akamai sought a tolling agreement from both DBSI and its parent DB AG to preserve its claims. DBSI's counsel agreed to a tolling agreement on behalf of DBSI, but informed Akamai's counsel that DB AG would not agree to a tolling agreement. This left Akamai with no choice but to file suit against DB AG or risk having those claims be time-barred.[6]

### ARGUMENT

### I.     LIFTING THE STAY TO ALLOW PARTICULARIZED DISCOVERY AGAINST DB AG IS NECESSARY TO PREVENT UNDUE PREJUDICE TO AKAMAI

### A.     Legal Standard

The PSLRA provides that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that

---

[5] For a fuller discussion of Akamai's claims against DB AG, see Akamai's memorandum in opposition to DB AG's motion to dismiss at pages 1-8.

[6] Additionally, once Akamai filed against DB AG, DBSI terminated its tolling agreement with Akamai, forcing Akamai to file its arbitration claims against DBSI. Discovery in such an arbitration is quite narrow; for instance depositions are disfavored and rarely occur. *See* FINRA Customer Code Rule 12510 ("Depositions are strongly discouraged in arbitration.").

particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B).

**1.      Interpretive Context of the Stay Provision and Its Exceptions**

The legislative history of the PSLRA indicates congressional intent to "curb abuse in private securities lawsuits, particularly the filing of strike suits." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir. 1999); *In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 106 (D. Mass. 2002) (same); *In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 260 (D. Mass. 2001) (same). These courts have noted that Congress's particular targets were "unmeritorious class actions," particularly those prompted only "because of a decline in stock prices." *In re Galileo Corp.*, 127 F. Supp. 2d at 260; *see also Van Ormer v. AspenTech, Inc.*, 145 F. Supp. 2d 101, 103 (D. Mass. 2000) (describing Congress's purpose as to "eliminate baseless suits filed when a company's stock drops"); *In re Lernout*, 214 F. Supp. 2d at 106 (same).

The legislative history of the PSLRA's discovery stay provision reveals that it was motivated by these same concerns. Conference reports reveal that Congress intended the statutory stay to minimize the incentives for class action plaintiffs armed with only a drop in stock prices to "discover" their way into a facially sustainable claim, *see* S. Rep. No. 104-98 at 14 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 693, or to file a frivolous claim with the expectation that the "cost of discovery often forces innocent parties to settle frivolous securities class actions." H.R. Conf. Rep. No. 104-369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731 at 37,735 (*quoted in In re Lernout*, 214 F. Supp. 2d at 106). This history reveals what the stay provision was, and was not, intended to accomplish – specifically, that Congress intended to prevent "fishing expeditions," not to assist perpetrators of frauds to delay or escape liability. *See In re Lernout*, 214 F. Supp. 2d at 106.

When considering whether a particular case falls within the exceptions to the PSLRA, courts have found it useful to consider whether the requested discovery would be "consistent with the intent of the stay provision" and have ordered such discovery when the perceived abuses addressed by Congress are not present. *In re Lernout*, 214 F. Supp. 2d at 106 (lifting stay where concerns not implicated); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 250 (D. Md. 2004) (collecting cases and noting that "it makes sense to interpret the broad, undefined terminology of this provision in light of Congress's purposes in passing the PSLRA"); *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002) (lifting stay where, *inter alia*, the request "involve[d] a clearly defined universe of documents," and because the plaintiffs "[were] not in any sense engaged in a fishing expedition or an abusive strike suit and . . . not thereby act[ing] in contravention of the fundamental rationales underlying the PSLRA discovery stay").

This approach comports with the First Circuit's general counsel that the text of the PSLRA should be interpreted consistently with this undisputed legislative context. *See Greebel*, 194 F.3d at 192 (recognizing the importance of considering this legislative history in construing the PSLRA because "[e]ven seemingly straightforward text should be informed by the purpose and context of the statute" and because "this Court and the Supreme Court have checked a sense of a statute's plain meaning against undisputed legislative history as a guard against judicial error").

2.      **Standard for Permitting Lifting of Stay**

The PSLRA allows a court to lift the stay of discovery when discovery is required either to (1) preserve evidence, or (2) prevent "undue prejudice" to the plaintiff. *See* 15 U.S.C. § 78u-4(b)(3)(B). To be allowed, such discovery must be "particularized." *Id.* The case law has

9

defined "undue prejudice" in the context of the PSLRA discovery stay to mean "improper or unfair detriment that need not reach the level of irreparable harm." *In re Lernout*, 214 F. Supp. 2d at 107. In determining whether such prejudice is 'undue," courts have expressly weighed the prejudice to the plaintiff in the context of the burden imposed on the defendant. As Judge Chin recently explained, "[c]ourts weigh the burden to defendants against the potential prejudice to plaintiffs, focusing on the production costs to defendants and plaintiffs' need for early review of the documents." *In re Bank of America Corp. Sec.& ERISA Litig.*, 09-MDL-2058, 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) (Chin, J.) (internal citation omitted). Judge Chin further explained that in determining whether to lift the stay, "courts may take all facts into account to determine whether undue burden would exist." *Id.*

In assessing the relative amounts of prejudice, courts have considered such factors as (i) whether the "volume of requested documents is . . . unreasonable" in the overall context of the litigation, (ii) whether the request seeks a "clearly defined universe of documents," and (iii) if "the burden of producing the materials . . . [is] slight, considering that the defendants have previously produced them to other entities." *In re Royal Ahold N.V.*, 220 F.R.D. at 250 (collecting cases); *see also In re Delphi Corp.*, MDL No. 1725, 2007 WL 518626, at *5 (E.D. Mich. Feb. 15, 2007). In many cases, courts have focused on the last factor, permitting discovery of documents that the defendant already produced to the SEC or another government agency. *See, e.g., In re Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581 (N.D. Ohio 2004) (permitting plaintiffs to obtain documents produced to governmental entities); *Firstenergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) ("Without discovery of documents already made available to government entities, Plaintiffs would be unfairly disadvantaged in pursuing litigation and settlement strategies."); *Singer v. Nicor, Inc.*, No. 02 Civ. 5168, 2003 WL

22013905, at *2 (N.D. Ill. Apr. 23, 2003) (lifting stay where plaintiffs would be disadvantaged if they did not have access to the documents previously provided to the government and other agencies); *In re Tyco Int'l Ltd. MDL*, No. MDL 02-1335-B, 2003 WL 23830479, at *4 (D.N.H. Jan. 29, 2003) (lifting stay where discovery imposes no additional costs and claims are not frivolous); *In re Enron Sec. Derivative & "ERISA" Litig.*, No. MDL 1446, H-01-3624, 2002 WL 31845114, at *1 (S.D. Tex. Aug.16, 2002) (lifting stay as to materials already made available to numerous government agencies).

This approach comports with common sense. As a court recently observed in lifting the PSLRA stay in an ARS case: "[o]ne of the principal purposes of the PSLRA discovery stay is to eliminate the cost of discovery before the potential merit of a case is assessed at the motion to dismiss phase. However, that burden is slight when a defendant has 'already found, reviewed and organized the documents.'" *Waldman v. Wachovia Corp.*, 08 Civ. 2913(SAS), 2009 WL 86763, at *2 (S.D.N.Y. Jan. 12, 2009) (quoting *In re LeBranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004)). This is true even when the volume of documents is significant in the abstract. *See In re Royal Ahold N.V.*, 220 F.R.D. at 250 (noting that while "particularized" "is not synonymous with 'identifiable,' neither does it necessarily mean 'small'" and that the "meaning of the phrase in any particular case must take into account the nature of the underlying litigation").

Additionally, in producing documents to the government, defendants and others have had the opportunity to review those documents carefully, thus putting plaintiffs at a strategic disadvantage with respect to discovery. Some courts have found this strategic disadvantage to constitute undue prejudice within the meaning of the case law. For example, in permitting limited discovery of already-produced documents, courts have noted that without such discovery,

plaintiffs would be unable to make "informed decisions about [their] litigation strategy in a rapidly shifting landscape." *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004) (quoting *In re Worldcom*, 234 F. Supp. at 305); *Gervis v. Berg*, No. 00 Civ. 3362, 2005 WL 3299436, at *3 (E.D.N.Y. Nov. 29, 2005). Such a strategic disadvantage would arise here should DB AG be permitted to withhold discovery of documents that it has presumably reviewed carefully when producing them to the SEC and the attorneys general.

**B.     Akamai's Application for Particularized Discovery From DB AG and DBSI**

Akamai's discovery request fits squarely within the standards established for lifting a discovery stay. First, Akamai's claims are not frivolous, as evidenced by the results of the SEC's investigation detailed in its complaint and the state attorneys general settlements. Second, Akamai's request for discovery is not a fishing expedition; rather, Akamai seeks a defined set of documents. Finally, the burden on DB AG to produce documents that it has already produced in multiple forums is minimal.

As described above, Akamai has already been prejudiced by the delays caused by DB AG and DBSI: first, in failing to abide by the terms of the Consent Judgment; then, in seriatim tactical maneuvers to delay and derail Akamai's attempt to recover its losses herein. Akamai's investment strategy was premised on the need for liquidity – quick access to the $217 million in funds to use for Akamai's strategic business purposes. For over two years, Akamai has been unable to access those funds. If the court does not lift the discovery stay, Akamai will endure additional delay in pursuing its claims, as to which it has not received a shred of discovery for over seven months due to DB AG's stratagem of seriatim motions.

In this age of electronic discovery, the cost to DB AG of producing the discovery sought by Akamai – namely, the limited universe of documents that DB AG or DBSI already produced

to the government – would be virtually nil. Producing those documents would start to level the playing field between DB AG and Akamai, by giving Akamai access to at least some of the documents DB AG has already carefully reviewed and disclosed and been able to use to plot its litigation strategy. Moreover, lifting the stay would be particularly appropriate here – even more so than in the other cases that permitted production of documents already produced to the government – because the Consent Judgment that resulted from the SEC's investigation specifically sets out obligations that DB AG and DBSI have to Akamai, as well as to other investors who are similarly situated to Akamai. In other words, Akamai is an intended beneficiary of that agreement. Refusing Akamai access to the documents that formed the basis for DB AG to agree to those obligations (even if it did not later fulfill them) would exacerbate the prejudice that Akamai has already suffered.

Additionally, DB AG's tactical maneuvers to date give Akamai reason to doubt that DB AG (and other institutions that hold relevant documents) will preserve all of documents that Akamai considers relevant to its claims. DB AG has shown every indication of construing both Akamai's claims and Akamai's entitlement to discovery as narrowly as possible. For example, in Akamai's arbitration against DBSI, DBSI has taken the position that it need not produce even the limited universe of documents required by the Financial Industry Regulatory Authority's ("FINRA") automatic disclosure provision – objecting to FINRA's requirements that it produce any notes about Akamai's account, for instance, as "overly broad . . . unduly burdensome, and not 'specific' . . . as required by the FINRA rules." *See* DBSI's FINRA response (Gass Aff., Ex. D). DB AG's and DBSI's interpretation of Akamai's entitlement to federal discovery – which is broader than the FINRA discovery DBSI claims to be too burdensome – is likely to be even more limited, thus prejudicing Akamai's ultimate ability to provide additional evidence for its

allegations. *See In re Lernout*, 214 F. Supp. 2d at 107 (noting that "once the PSLRA has been satisfied, the general presumption for liberal discovery becomes the backstop").

Permitting this limited discovery to proceed in this case is consistent with the intent of Congress in enacting the PSLRA's stay provision. Akamai would already have recovered the par value of its securities under the SEC settlement had it only been a different size company and had it invested a different amount of money with DB AG. Because of this arbitrary feature – and DB AG's stubborn litigation tactics – Akamai has been severely prejudiced in gaining through litigation what other smaller investors have recovered through the regulators' settlements. These features render this lawsuit the farthest possible case from a strike suit premised only on a fall in share price. Accordingly, the PSLRA's stay provision was not intended to cover Akamai's claim against DB AG, and the circumstances presented herein bring it expressly within the exception provided for in that statute.

## II.   AKAMAI SHOULD BE PERMITTED TO ISSUE DOCUMENT PRESERVATION SUBPOENAS TO THIRD PARTIES

While the PSLRA includes a provision requiring all parties to preserve relevant documents during the pendency of a stay, *see* 15 U.S.C. § 78u-4(b)(3)(C), that obligation is not imposed on parties to the action, and does not extend to third parties who might have relevant documents in their possession or control. *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1270, 1272 (D. Minn. 1997). Absent court-ordered intervention, non-parties (who may not even know about the litigation) are free to destroy documents during the pendency of the stay. *Koncelik v. Savient Pharm., Inc.*, No. 08 Civ. 10262, 2009 WL 2448029, at *2 (S.D.N.Y. Aug. 10, 2009) ("[W]hat will or will not ultimately prove to be admissible cannot be established with any degree of certainty at this early stage in the litigation. The only thing that is certain is that

without preservation subpoenas, the third party corporations in possession of potentially relevant information are free to destroy that information.").

Courts have routinely relied upon this lack of third-party obligation to preserve documents to support granting third-party document preservation subpoenas as "necessary to preserve evidence" under 15 U.S.C. § 78u-4(b)(3)(B). This is true even when the destruction of evidence would be caused by the routine destruction of electronic information by corporations, or inadvertent destruction of evidence in the absence of a stay. *See, e.g., Koncelik v. Savient Pharm., Inc.*, 2009 WL 2448029, at *2; *In re Nat'l Century Fin. Enter., Inc. Fin. Inv. Litig.*, 347 F. Supp. 2d 538, 542 (S.D. Ohio 2004) (holding that destruction of documents by liquidating third-party company would constitute undue prejudice by "effectively shield[ing] the defendants from eventual liability"); *In re Tyco Int'l, Ltd. Sec. Litig.*, No. 00MD1335, 2000 WL 33654141, at *4 (D.N.H. Jul. 27, 2000) (finding undue prejudice satisfied by showing that "evidence relevant to plaintiffs' claims might be inadvertently destroyed by third parties without notice of this action).

For this reason, "courts have generally permitted plaintiffs in PSLRA actions to 'issue subpoenas that give specified third parties notice of the action and impose upon them only a duty to preserve certain relevant evidence in their possession.'" *In re Refco, Inc.*, No. 5 Civ. 8626, 2006 WL 2337212, at *5 (S.D.N.Y. Aug. 8, 2006) (collecting cases); *see also Koncelik*, 2009 WL 2448029, at *2; *In re Nat'l Century Fin. Enter., Inc. Fin. Inv. Litig.*, 347 F. Supp. 2d at 540-42.[7] Indeed, such a ruling has been made on virtually identical facts as those here: a federal action by a corporation for violation of Section 20(a) of the securities laws, for improper purchases of ARS by the defendant financial institution. The district court in New York

---

[7] Because such subpoenas do not allow plaintiffs to take advantage of discovery to bolster frivolous claims, they are "consistent with the purposes underlying the PSLRA." *In re Tyco Int'l, Ltd. Sec. Litig.*, 2000 WL 33654141, at *5.

permitted the plaintiff corporation in that ARS action to issue third-party document preservation subpoenas during the pendency of a PSLRA discovery stay, and promptly ruled on the application at the oral argument so as not to prejudice the plaintiff's efforts to maintain the status quo. *See STMicroelectronics, N.V. v. Credit Suisse Group*, No. 08-03201 (RJD) (E.D.N.Y. Mar. 16, 2010) (Gass Aff., Ex. E).

Akamai's request for leave to subpoena certain third parties to preserve particularized categories of evidence satisfies the applicable standards. The proposed subpoenas are necessary to prevent the recipients from failing to preserve relevant documents the destruction of which would cause Akamai undue prejudice.[8] For instance, if a third-party financial institution that Akamai seeks to subpoena engages in the destruction of documents, Akamai would be limited in its ability to establish the existence of communications and agreements between that institution and DB AG or DBSI. Such information might include, for example, communications making DB AG and DBSI aware of maximum rate waivers and dramatically increased inventories of ARS, signaling a massive drop in liquidity in the ARS market. Similarly, Akamai would be deprived of preserving documents from other DBSI customers that could show that DBSI escalated sales of ARS precisely at the moment that it sought to reduce its own exposure to the risk of imminent market collapse.

The case for third-party document preservation subpoenas is particularly acute in Akamai's situation, because DB AG has likely been provided access to many of these documents in the past in arbitrations or litigation, as well as in investigations conducted by various governmental entities (at the very least from DBSI, its wholly-owned subsidiary, which it controls). Under these circumstances, allowing these documents to be destroyed by third parties

---

[8] A sample schedule of documents sought to be preserved in the proposed subpoenas is attached to Gass Aff., Ex. F.

before Akamai has the opportunity for equal access as DB AG would cause Akamai undue prejudice.

## CONCLUSION

For the reasons stated above, Akamai respectfully moves this Court to permit Akamai to seek the discovery that DB AG and DBSI have already provided to the SEC and state attorneys general, as well as to issue document preservation subpoenas to third parties.

Dated: September 27, 2010

Respectfully submitted,

AKAMAI TECHNOLOGIES, INC. AND
AKAMAI SECURITIES CORPORATION

/s/ Michael T. Gass
Michael T. Gass (BBO #546874)
Jennifer E. Tracy (BBO #661539)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel: (617) 248-4750

Andrew Weissmann (*admitted pro hac vice*)
Michael W. Ross (*admitted pro hac vice*)
Elizabeth A. Edmondson (*admitted pro hac vice*)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Tel: (212) 891-1600

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants on September 27, 2010.

/s/  Michael T. Gass
Michael T. Gass

4738370v1