UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| AKAMAI TECHNOLOGIES, INC. and AKAMAI SECURITIES CORPORATION, | ) ) ) | |
| | ) | Civil Action No: |
| | ) | 10-CV-10254-JLT |
| Plaintiffs, | ) ) | |
| | ) | Leave to File Reply |
| v. | ) ) | GRANTED on October 26, 2010 |
| | ) | |
| DEUTSCHE BANK AG, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

_____

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR DISCOVERY**

Michael T. Gass
Jennifer E. Tracy
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel: (617) 248-4750

Andrew Weissmann
Michael W. Ross
Elizabeth A. Edmondson
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Tel: (212) 891-1600

*Counsel for Akamai Technologies, Inc. and Akamai
Securities Corporation*

4754659v1

**TABLES OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

    I.   Akamai's Requested Discovery Is Manifestly Relevant to Akamai's Claims. ................... 2

    II.  DB AG Wrongly Contends that Akamai's Requests Are Not Particularized. ................... 6

    III.  The Requested Discovery Is Necessary to Preserve Evidence and
       Prevent Undue Prejudice ................................................................................................ 7

CONCLUSION .................................................................................................................... 10

## TABLES OF AUTHORITIES

**Page(s)**

**Cases**

*In re Atl. Fin. Mgmt., Inc.*,
    784 F.2d 29 (1st Cir. 1986) .................................................................................... 2

*In re Delphi Corp.*, No. 05-md-1725,
    2007 WL 518626 (E.D. Mich. Feb. 15, 2007) ................................................... 3

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ............................................................................... 2

*In re LaBranche Sec. Litig.*,
    333 F. Supp. 2d 178 (S.D.N.Y. 2004) ............................................................. 6, 10

*In re Lupron Marketing and Sales Practices Litig.*,
    313 F. Supp. 2d 8 (D. Mass. 2004) ..................................................................... 7

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978) ............................................................................................ 5

*In re Royal Ahold N.V. Secs. & ERISA Litig.*,
    220 F.R.D. 246 (D. Md. 2004) ........................................................................ 6, 8

*Singer v. Nicor, Inc.*, No. 02-cv-5168,
    2003 WL 22013905 (N.D. Ill. Apr. 23, 2003) .............................................. 9-10

*Waldman v. Wachovia Corp.*,
    No. 08-cv-2913 (SAS), 2009 WL 86763 (S.D.N.Y. Jan. 12, 2009) ............... 6, 8

*In re WorldCom, Inc. Sec. Litig.*,
    234 F. Supp. 2d 301 (S.D.N.Y. 2002) ............................................................. 6, 9

**Statutes**

15 U.S.C. § 78u-4 ..................................................................................................... 8

Plaintiffs Akamai Technologies, Inc. and Akamai Securities Corporation (collectively, "Akamai" or "Plaintiffs") submit this reply memorandum in further support of their motion to lift the automatic stay under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), to allow Akamai to seek particularized discovery and to issue document preservation subpoenas to third parties.

## PRELIMINARY STATEMENT

In its opposition to Plaintiffs' motion for discovery, DB AG ("Defendant" or DB AG") mischaracterizes the nature of this action and distorts the applicable standard on this motion in an attempt to deny Akamai discovery that is plainly relevant to its claims, and which Defendant can readily produce. Moreover, DB AG opposes the use of document preservation subpoenas that are often granted to replicate the preservation of documents required of parties by the PSLRA.

Akamai addresses herein three main points raised by DB AG. First, Akamai's control person claims against DB AG are properly stated against a party that controls the entity and people that committed the underlying fraud. That the fraud occurred is clearly alleged with specificity in the complaint and has been set forth in regulators' complaints as well, which DB AG tellingly has not denied. In short, this is not a baseless shareholder suit seeking to discover its way into a claim, and which the PSLRA was designed to address.

Second, DB AG wrongly asserts that Akamai's discovery request is not particularized because it could involve the production of voluminous documents. For instance, DB AG contends that the motion is improper because it seeks discovery related to the underlying fraud, but that is an important element of the control liability claim asserted in this litigation.

Third, the requested discovery is necessary to preserve evidence from DB AG and third parties that are under no notice of this suit or obligation to preserve relevant documents, and also to prevent undue prejudice. Although Akamai has established both exceptions to the PSLRA, either

one entitles it to the documents it seeks.

## ARGUMENT

**I.    Akamai's Requested Discovery Is Manifestly Relevant to Akamai's Claims.**

In arguing that the complaint is a heartland case to which the PSLRA exceptions should not apply, DB AG mischaracterizes this case as a "strike suit" (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Lift the PSLRA Discovery Stay ("DB Opp.") 7), a "fishing expedition" (*id.* at 8), and a "tactical maneuver" that is designed simply "to obtain discovery that is likely unavailable to [Plaintiffs] in their FINRA arbitration against DBSI" (*id.* at 3).  DB AG's contentions are meritless.

First of all, as Akamai has properly pleaded a Section 20(a) claim against DB AG, it needs no "tactical" purpose to seek discovery relevant to this claim.  DB AG is a proper party to pursue herein, as this Court tacitly already determined when it denied DB AG's motion for a stay. Congress enacted Section 20(a) of the Exchange Act as a cause of action to expand liability for securities violations by entities with the power to control corporate relatives that commit securities fraud. *See In re Atl. Fin. Mgmt., Inc.*, 784 F.2d 29, 33 (1st Cir. 1986) (Breyer, J.).

Strike suits – as defined by the very case DB AG relies upon – are meritless shareholder actions brought with the hope that a lawsuit's nuisance value will lead to sizable attorney's fees or a substantial out-of-court settlement. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 n.5 (1st Cir. 1999).  Akamai is not a disgruntled shareholder reflexively fishing for a fraud claim after a drop in stock price.  Rather, Akamai is a Massachusetts-based corporation seeking to recover funds that it entrusted to the securities brokerage arm of a bank to invest in safe and liquid instruments, but that were fraudulently steered into patently unsuitable long-term securities.  DB AG and its wholly-owned subsidiary, Deutsche Bank Securities, Inc. ("DBSI"), have already settled a Securities and Exchange Commission ("SEC") action growing out of the very same fraud, and have

not denied the fraud alleged therein. *SEC v. Deutsche Bank Secs. Inc.*, No. 09-cv-05174 (LAP) (S.D.N.Y.). The same fraud was the subject of a settlement between DB AG, as parent of DBSI, and the North American Securities Administrators Association ("NASAA"). The Akamai complaint and these regulatory actions against DB AG make clear that this is no "fishing expedition." *See In re Delphi Corp.*, No. 05-md-1725, 2007 WL 518626, at *8 (E.D. Mich. Feb. 15, 2007) ("The fact that the SEC brought an action predicated upon the very same accounting irregularities alleged in the Consolidated Class Action Complaint . . . coupled with the fact that Defendants are consenting to judgment in that action, demonstrates that this is not a 'frivolous securities class action' brought against innocent parties.").

In those regulatory actions DB AG and DBSI produced documents relating to their specific involvement in the ARS market and those documents formed the basis for extensive factual findings by the regulators. Indeed, but for Akamai's size, those findings would be directly applicable and would cover Akamai's contentions herein.[1] It is disingenuous for DB AG to claim that Akamai's complaint is any more frivolous than the actions of the state and federal regulators with whom Defendant and its wholly-owned subsidiary have settled; indeed, it is less so, since Akamai has the benefit of reliance on those findings.

The complaint in the SEC case and the findings of numerous state regulators eviscerate DB AG's repeated argument that documents produced in those cases are not relevant to Akamai's claims in this case. (*See* DB Opp. 2, 9-11.) Even a cursory comparison of a few paragraphs of the complaints in this case and the SEC case makes this plain:

| SEC Complaint | Akamai Complaint |
|---|---|
| ¶ 1: This is a case in which DBSI misled its customers about the fundamental nature and | ¶¶ 2-3: Akamai instructed Deutsche Bank Securities, which served as Akamai's |

---

[1] As noted in Akamai's opening brief support of its motion to lift the discovery stay, the settlements required DBSI to buy back ARS from small to medium sized businesses that had $10 million or less in assets in their accounts with DB AG, and required DBSI to provide liquidity solutions to larger companies such as Akamai. (*See* Akamai Mem. 5-6.)

| | |
|---|---|
| risks associated with auction rate securities ("ARS") that it underwrote, marketed and/or sold.  Through certain client advisors ("CAs") at one of its divisions, third-party marketing materials, and accounts statements, DBSI misrepresented to its customers that ARS were safe, highly liquid investments comparable to cash or money market instruments.  As a result, numerous customers purchased ARS using funds that they needed to remain available on a short-term basis. | investment advisor and broker, to invest in safe and liquid securities because it needed ready access to the money entrusted to Deutsche Bank Securities to fund its operations.  Deutsche Bank Securities touted ARS to Akamai as fitting this profile. . . . Deutsche Bank . . . perpetuated the illusion that the securities were fully liquid, even when it knew demand for ARS was waning. Customers like Akamai thus remained unaware of the increasing liquidity risk that ARS posed. |
| ¶¶ 2-3: DBSI reinforced this perception of liquidity by committing its own capital to support ARS auctions for which it served as the lead manager to ensure that those auctions did not fail.  DBSI's CAs, however, failed to disclose to customers that DBSI placed supporting bids in ARS auctions to cover any potential shortfall of buyers and that, without such support, the auctions could fail, thereby rendering the customers' holding illiquid. *See also id.* ¶¶ 50-56. | ¶ 3: Nor did Deutsche Bank disclose to Akamai that the liquidity of the ARS market was being artificially supported by Deutsche Bank and other financial institutions, which were secretly propping up the ARS market. As one means of covertly supporting the ARS market so that it would appear to investors to be safer than it actually was, Deutsche Bank and other financial institutions were party to or aware of secret side deals with ARS issuers to ensure that auctions did not fail due to lack of demand.  *See also id.* ¶¶ 30, 35, 43. |
| ¶ 4:   During the fall of 2007, certain individuals at DBSI became aware of mounting evidence that the ARS market no longer retained its historical stability. Investor concerns about the creditworthiness of monoline insurance companies . . . , higher than normal inventory level in certain segments of the ARS market and auction failures in those markets indicated that the risk of auction failures had materially increased.  Certain individuals at DBSI knew these material facts but continued to market ARS as highly liquid and, therefore, did not disclose to its customers timely, complete and accurate information about ARS. *See also id.* ¶¶ 38-49. | ¶¶ 28, 34: In August 2007, several dozen ARS auctions failed, many of which were underwritten or managed by Deutsche Bank Securities. Although the auction failures in August 2007 were not of student loan securities, the problems that caused the failures were common to ARS generally, as Deutsche Bank realized.  Indeed, in response to the August 2007 auction failures, Deutsche Bank Securities decided to cancel a planned underwriting of a new student loan security, even though no student loan securities had yet failed at auction. Deutsche Bank Securities understood that the disruptions in one part of the ARS market could (and already had) spread to other sectors, including student loan securities. Deutsche Bank did not, however, inform Akamai of the failed auctions, the increased risk of failures for other ARS, or its |

4

| | cancellation of the underwriting.  *See also id.* ¶¶ 29-36.[2] |
| --- | --- |

Contrary to DB AG's contention, Akamai is not seeking documents from regulators on a broader array of subjects than are pertinent to its claims.  Rather, Defendant's view of relevancy is myopic.  DB AG argues that documents produced to regulators concerning ARS other than those ARS Akamai currently holds, and documents generated by divisions within DB AG or DBSI other than those Akamai dealt with directly, cannot be relevant.  That is wrong.  The August 2007 ARS failures in several segments of the ARS market – segments marked by poorer collateral quality – affected DB AG and investors' perception of the safety and liquidity of the ARS market generally, resulting in "contagion" to all sectors of the ARS market.  This culminated in the market-wide ARS failures of February 2008.  Documents that concern the lack of liquidity in the ARS market and growing risks throughout the fall and winter of 2007 are relevant to the Defendant's knowledge and failure to disclose its information to Akamai.[3]

DB AG suggests that the only evidence relevant to this case is its control of DBSI.  (*See* DB Opp. 2, 10).  This is wrong because an underlying violation of the securities laws is an element of the Section 20(a) claim.  Therefore, the documents relevant to Akamai's underlying fraud claim – not just those documents relevant to DB AG's control status – are relevant to its Section 20(a) claim

---

[2] The same is true of the findings of the state regulators that entered consent orders with DB AG and DBSI.  These state regulators found, for example, that:

> Certain DBAB agents misrepresented the characteristics of ARS to clients.  Certain DBAB agents told clients that ARS were "safe and liquid," "cash equivalents," and "just like money markets." . . . Certain DBAB clients maintained investment policies and objectives designed to place their money in safe and liquid investments.  Certain DBAB agents sold ARS to these DBAB clients, despite their investment policies and objectives, which sought safe and liquid investments . . . .  By engaging in the practice of placing supporting bids to prevent failed ARS auctions and failing to disclose the practice to clients, DBAB engaged in dishonest and unethical conduct in the securities business with respect to the marketing and sale of ARS.

(Gass Aff. (Dkt. No 39), Ex. C ¶¶ 15, 17-18, 33.)  "DBAB" refers to Deutsche Bank Alex Brown, a division of DBSI.  (*See id.* ¶ 9.)

[3] See *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (relevancy "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.").  At the very least, such documents are plainly discoverable as evidence of knowledge of wrongdoing under Rule 404(b).

4754659v1

5

against DB AG.  In short, far from expanding the bounds of Rule 26 relevance, Akamai is seeking core documents that directly support its claims.

## II.     DB AG Wrongly Contends that Akamai's Requests Are Not Particularized.

Akamai seeks documents that were previously reviewed, assembled, and produced to regulators investigating the very same ARS fraud at issue here.  Although this universe of documents may be (but is not necessarily) large, it is particularized.  Particularized does not mean small in number.  *See In re Royal Ahold N.V. Secs. & ERISA Litig.*, 220 F.R.D. 246, 250 (D. Md. 2004) ("Yet if 'particularized' is not synonymous with 'identifiable,' neither does it necessarily mean 'small.'").  Akamai seeks a "clearly defined universe of documents" that was already produced, making its request particularized.  *Id.* (quoting *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002)).  Indeed, a request aimed at all documents previously produced actually reduces the burden on DB AG by obviating the need for DB AG to exhaust time and expense combing through productions to satisfy piecemeal discovery requests.[4]  *See In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004) (citing case law in which "the court lifted the discovery stay when the defendant could not allege any burden from producing the requested information because the defendant had already reviewed, compiled and produced the requested information to the government").

Nonetheless, DB AG argues that it will be required to re-review all of the previously produced documents for relevance and privilege.  (*See* DB Opp. 9.)  But both such reviews have surely been done already – something DB AG tellingly does not deny.  DB AG's cagily written assertion that it had a non-waiver agreement with regulators is sophistry.  Because DB AG knows

---

[4] DB AG criticizes *Waldman v. Wachovia Corp.*, No. 08-cv-2913 (SAS), 2009 WL 86763 (S.D.N.Y. Jan. 12, 2009) for having "improperly created a balancing test" to be utilized on a motion such as this. (*See* DB Opp. 14 n.7.)  But in these motions "[c]ourts weigh the burden to defendants against the potential prejudice to plaintiffs, focusing on the production costs to defendants and plaintiffs' need for early review of the documents." *In re Bank of Am. Corp. Secs., Derivative, & ERISA Litig.*, No. 09 MDL 2058(DC), 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009).  Akamai's motion for particularized discovery meets this balancing test.

that courts do not routinely uphold such agreements (and Congress has failed to pass legislation making disclosure to regulators a privileged event), it strains credulity to believe that DB AG turned over privileged documents to regulators.  Notably, DB AG does not say that it did, precisely because it surely conducted a privilege review and did not disclose such documents.  In *In re Lupron Marketing and Sales Practices Litigation*, 313 F. Supp. 2d 8, 12 (D. Mass. 2004), the court noted that every circuit but the Eighth that has addressed the issue has ruled that voluntary disclosures to the government in the enforcement context destroy the attorney-client privilege. Moreover, Akamai is entering into a confidentiality agreement with DBSI and is prepared to enter into the same type of non-waiver agreement that DB AG apparently entered into with government parties.

Finally, regarding the proposed subpoenas to third-party financial institutions, DB AG's argument that Akamai does not specify the precise names of the target banks is beside the point. (*See* DB Opp. 17-18.)  The subpoenas are targeted to those financial institutions that served as market makers, auction agents, or interacted with DBSI and DB AG with respect to the ARS market.  Akamai will serve the sample subpoena attached to its motion to the following institutions: Bank of America, N.A., Citigroup, Inc., Credit Suisse Securities (USA) LLC, The Goldman Sachs Group, Inc., JPMorgan Chase & Co., Merrill Lynch & Co., Inc., Morgan Stanley, Royal Bank of Canada, and UBS.  Further, Akamai has set forth the precise types of documents in its motion, including the subpoena it would serve on third-party banks.[5]  This showing is sufficient.

**III.     The Requested Discovery is Necessary to Preserve Evidence and Prevent Undue Prejudice.**

DB AG repeatedly intones that Congress did not carve out an exception to the discovery stay

---

[5] Examples of the key types of documents covered include documents concerning maximum rate waivers – emergency measures that temporarily permitted ARS auctions to clear under circumstances that otherwise would likely have caused failures and telltale signs that liquidity in the ARS market was illusory – and documents concerning the increased commissions paid by various banks to downstream broker-dealers, such as DBSI, to incentivize the sale of ARS to investors at a time when liquidity in the market was evaporating.

for documents previously produced to regulators.  (*See* DB Opp. 6-7, 12-13.)  But that is not the test: if such documents in a particular case fall within the PSLRA exceptions, they must be produced.  Indeed, numerous courts have ordered the production of documents turned over to regulators based on the same statutory language relied upon by Akamai.  *See, e.g.*, *Waldman*, 2009 WL 86763, at \*2 (ordering such production under 15 U.S.C. § 78u-4(b)(3)(B)); *Royal Ahold*, 220 F.R.D. at 251-52 (same).

The proposed subpoenas are necessary to ensure that third-parties preserve documents relevant to the claims at issue.  DBSI is a third party to this lawsuit, and there is nothing in this case that requires it to retain any documents; even if it unilaterally determines to retain documents, it can set the scope of such retention.  Notably, the position taken by DBSI in the related FINRA arbitration – in which DBSI has refused to disclose documents specifically listed by FINRA as requiring production – evidences that DBSI's view of relevance in this case is unreasonably narrow.  In its recent response to Akamai's discovery requests (attached hereto as Exhibit A), DBSI has even denied the relevance of the documents it produced to regulators in this matter, and claimed that their production would be unduly burdensome.  (*See* Ex. A, Responses 9-10.)[6]  Further, there is simply no assurance that third parties unrelated to DB AG or DBSI will retain any documents, or are even aware of this action and the need to preserve relevant documents.

Moreover, DB AG itself has in its opposition to this motion demonstrated that it is not construing relevance broadly enough to preserve pertinent documents.  In its briefing, DB AG argues that documents pertaining to particular divisions and particular types of ARS are irrelevant

---

[6] FINRA has Discovery Lists set forth in the FINRA Discovery Guide (attached hereto as Exhibit B), which set forth the documents that FINRA has itself deemed relevant and discoverable.  DBSI's response (attached hereto as Exhibit C) has unilaterally and improperly narrowed the scope of documents DBSI considers relevant and responsive.  Most notably, in response to FINRA requests explicitly requiring the production of documents relating to the "transactions *or products at issue*," DBSI has agreed to product only documents relating to the "transactions at issue."  (See Ex. C. Responses to Lists 7, 9, 13.  DBSI's narrow position excludes plainly relevant and discoverable documents pertaining to the ARS "products at issue."

to this case.  As noted above, that is plainly wrong.  Documents concerning the sudden failure of ARS in August 2007 could not be more central to Akamai's claims.  The requested discovery is therefore necessary to preserve documents that are critical to the case, but that both DB AG and DBSI have shown they intend to treat as irrelevant.

The requested discovery is also necessary to prevent undue prejudice to Akamai.  Based on the terms of the regulatory settlements, Akamai would already have recovered the par value of its securities under the SEC settlement had it only been a different size company and had it invested a smaller amount of money with DB AG.  It would be unfair and prejudicial to penalize Akamai in this litigation for the fact that its loss of liquidity, and consequently its injury, is greater than that suffered by investors who have already recovered the par value of their portfolios.  Years after the collapse of the ARS market, Akamai still has not recovered a dime as a result of the DB AG fraud and has received no discovery.[7]  Obtaining the documents already produced in regulatory proceedings covering the fraud would finally level the playing field between Akamai and DB AG by providing Akamai with documents that DB AG and DBSI – and regulators – have long ago had opportunity to review and analyze.

DB AG contends that cases like *In re WorldCom*, 234 F. Supp. 2d 301, found undue prejudice only because defendants had not turned over documents to plaintiffs when regulatory action was pending and when other plaintiffs had the documents during settlement discussions.  However, that is what happened here.  DB AG and DBSI have produced documents to, and reached settlements with, other plaintiffs, including but not limited to the SEC, state regulators, and individuals.  But, even assuming (contrary to fact) they had not, undue prejudice is not limited to the circumstances in *WorldCom*.  Numerous cases following *Worldcom* have found undue prejudice

---

[7] DB AG's arguments on delay totally miss the point.  (DB Opp. 15.)  While Akamai did request a tolling agreement with DB AG, DB AG did not agree to it, and the very purpose of Akamai's seeking a tolling agreement was to work out a faster resolution than proceeding to litigation.

in situations beyond those in *WorldCom*.  *See, e.g.*, *Singer v. Nicor, Inc.*, No. 02-cv-5168, 2003 WL 22013905, at \*2 (N.D. Ill. Apr. 23, 2003) ("Plaintiffs here may well be unfairly disadvantaged if they do not have access to the documents that the governmental and other agencies already have, during the pendency of the motion to dismiss."); *In re LaBranche*, 333 F. Supp. 2d at 183 ("In this case, the SEC and NYSE investigated and are continuing to investigate the precise schemes alleged by Lead Plaintiffs in the Complaint.  As a result of those investigations, LaBranche has agreed to pay more than $63.5 million to settle the regulators' claims.  If the stay remains in place, Lead Plaintiffs will be the only interested party without access to those documents and will be prejudiced by their inability to make informed decisions about their litigation strategy in this rapidly shifting landscape.").  In any event, the fact that the SEC has settled claims of parties directly parallel to those of Akamai only further supports the prejudicial effect of a stay of discovery on Akamai.

## CONCLUSION

In conclusion, Akamai respectfully moves this Court to permit Akamai to seek the discovery that DB AG and DBSI have already provided to the SEC and state attorneys general, and to issue preservation subpoenas to the specified third parties.

Dated: October 26, 2010

Respectfully submitted,

AKAMAI TECHNOLOGIES, INC. AND
AKAMAI SECURITIES CORPORATION

/s/ Michael T. Gass

| | |
|---|---|
| Andrew Weissmann *(admitted pro hac vice)* | Michael T. Gass (BBO #546874) |
| Michael W. Ross *(admitted pro hac vice)* | Jennifer E. Tracy (BBO #661539) |
| Elizabeth A. Edmondson *(admitted pro hac vice)* | CHOATE, HALL & STEWART LLP |
| JENNER & BLOCK LLP | Two International Place |
| 919 Third Avenue, 37th Floor | Boston, MA 02110 |
| New York, NY 10022 | Tel: (617) 248-4750 |
| Tel: (212) 891-1600 | |

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will

be sent to those indicated as non-registered participants on October 26, 2010.

/s/  Michael T. Gass
Michael T. Gass

4754659v1