UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC. and AKAMAI SECURITIES CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK AG,<br><br>Defendant. | Civil Action No.:<br>1:10 Civ. 10254 (JLT) |

### NOTICE OF SUPPLEMENTAL AUTHORITY

Defendant Deutsche Bank AG ("Defendant") respectfully submits this Notice of Supplemental Authority in support of the pending Motion to Dismiss (scheduled to be heard on January 13, 2011) to call to the Court's attention the attached Order Granting Motion to Dismiss issued on December 9, 2010 by the United States Court District Court for the Southern District of New York in *Pivot Point Capital Master LP, Individually and on Behalf of All Others Similarly Situated v. Deutsche Bank AG and Deutsche Bank Securities, Inc.*, No. 08 Civ. 2788 (S.D.N.Y. Dec. 9, 2010) (Attachment A), the auction rate securities class action brought against Defendant and its subsidiary.

The decision is relevant to, *inter alia*, Defendant's argument in the pending Motion to Dismiss that Plaintiffs have failed to plead reasonable reliance. *See* Defendant's Memorandum of Law in Support of Its Motion to Dismiss [Dkt #25], at pages 19-22; Defendant's Reply Memorandum of Law in Further Support of Its Motion to Dismiss [Dkt #32], at pages 13-14. Defendant previously submitted the transcript of the decision granting the motion to dismiss the prior complaint in the same auction rate securities class action. *See* Appendix of Auction Rate Securities Decisions Submitted with Defendant's Motion to Dismiss [Dkt #22-1], Tab 6.

Dated: January 7, 2011

RESPECTFULLY SUBMITTED:

DEUTSCHE BANK AG,
Defendant,

By its attorneys:

/s/ A. John Pappalardo
A. John Pappalardo, BBO #388760
Victor H. Polk, Jr., BBO #546099
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
Tel.: (617) 310-6000
Fax: (617) 310-6001
pappalardoj@gtlaw.com
polkv@gtlaw.com

Stephen L. Saxl (admitted *pro hac vice*)
Toby S. Soli (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400
saxls@gtlaw.com
solit@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent via U.S. first class mail to those indicated as non-registered participants on January 7, 2011.

/s/ A. John Pappalardo

# ATTACHMENT

# A

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/9/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
PIVOT POINT CAPITAL MASTER LP, Individually :
and on Behalf of All Others Similarly Situated,     :
                                                    :   **ORDER GRANTING**
                      Plaintiff,                    :   **MOTION TO DISMISS**
                                                    :
         -against-                                  :   08 Civ. 2788 (AKH)
                                                    :
DEUTSCHE BANK AG and DEUTSCHE BANK                  :
SECURITIES, INC.,                                   :
                                                    :
                      Defendants.                   :
------------------------------------------------------------- x
ALVIN K. HELLERSTEIN, U.S.D.J.:

      Defendants Deutsche Bank AG ("DBAG") and its subsidiary, Deutsche Bank Securities, Inc. ("DBSI") move under Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss a two-count Third Amended Complaint ("TAC") filed by Plaintiff Pivot Point Capital Master LP, a self-proposed Lead Plaintiff of a putative class action. The TAC alleges (i) a violation by DBSI of § 10(b) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78(j)b and Securities Exchange Commission ("SEC") Rules 10b-5(a), (b), and (c); and (ii) a violation by DBAG of § 20(a) of the SEA, 15 U.S.C. § 78t(a). For the reasons that follow, Defendants motion is granted and the TAC dismissed without leave to amend again.

**I. Background**

      This is another lawsuit brought to recover damages associated with losses incurred from the purchase of Auction Rate Securities.[1] A description of these securities and the conduct at issue in this case follows.

    **A. Auction Rate Securities**

---

[1] See, e.g., In re Merrill Lynch Auction Rate Sec. Litig., 09 MD 2030, 2010 WL 1257597 (S.D.N.Y. Mar. 31, 2010) (Preska, C.J.); In re UBS Auction Rate Sec. Litig., 08 Civ. 2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) (McKenna, J.)

1

Auction Rate Securities are variable-rate equity or debt instruments of long-term or perpetual duration that pay interest or dividends at rates set at periodic "Dutch" auctions, held every 7, 28, or 35 days.[2] In a successful auction, the number of shares bid for purchase at a particular rate exceeds the number of shares available; the shares are then sold for par value and the new holders obtain interest at the given rate, known as the "clearing rate." In a failed auction, no interest rate proposed by the auctioneer is sufficient to elicit bids for all the available securities. In that instance, the current holders of the securities have to retain their securities until the next successful auction. During the interval between the failed and the successful auction, the securities earn interest at a predetermined rate known as the "maximum rate."

### B. Defendants' Conduct

Plaintiff alleges that in 2007, Defendants engaged in a scheme to manipulate the market for Auction Rate Securities in a manner that would enable them to "bet against" the credit market that Defendants believed to be on the verge of collapse.

DBSI and another Deutsche Bank affiliate, DBTCA, established an entity known as "Hawser Trust," for which DBTCA was the trustee. Hawser Trust and DBAG entered into a series of synthetic credit default swaps, in which Hawser Trust held the obligation to pay DBAG and DBAG made regular payments to Hawser Trust.[3] The portfolio of reference entities for the synthetic credit default swaps comprised 125 corporate securities, 20 percent of which were securities backed by subprime mortgages. Hawser Trust securitized its obligations to DBAG into "Credit Linked Certificates" and sold the entire portfolio to a special purpose vehicle

---

[2] TAC ¶¶ 31-35.

[3] A credit-default swap is a transaction that provides an unsecured bondholder with contract protection against the bond's possible devaluation or default, for a premium paid by the bondholder to the credit obligor. In a "synthetic" credit default swap, the party seeking credit protection and paying the premium is not the bondholder, and the party providing protection does so in connection with a "reference entity," an entity whose financial condition is believed to reflect the financial condition of the security as to which protection is sought

2

established by DBSI, Capstan Master Trust. Capstan Trust then offered the CLCs for sale as Auction Rate Certificates, which became known as "Capstan ARCs."

On July 30, 2007, DBSI offered Capstan ARCs for sale to select Qualified Institutional Buyers through a Private Placement Memorandum ("PPM"). Capstan ARCs were ten-year securities offered with a maximum rate of 50 points over the London Interbank Offered Rate ("LIBOR"), a daily updated interest rate index reflecting interbank unsecured lending in the London market. DBSI, underwriter for the Capstan ARCs, was the broker-dealer for auctions, and Bank of New York was the auction agent. DBSI, as underwriter, purchased the entire offering, and made available to qualified purchasers $600 million of Capstan ARCs at par value. Plaintiff purchased $8.1 million.

Capstan Master Trust was the third special purpose vehicle DBSI established for the purpose of issuing Auction Rate Certificates. The other two, Camber Master Trust and Pivot Master Trust, issued Camber ARCs and Pivot ARCs for auction, respectively. Pursuant to the PPMs for Camber ARCs and Pivot ARCs, DBSI placed "support bids" in each auction for the sale of such ARCs, thus insuring the regular success of Camber ARC and Pivot ARC auctions between February and July 2007. Exercising discretion, DBSI did not place a support bid for the Capstan ARC, giving rise to plaintiff's complaint.

### C. The Capstan Private Placement Memorandum

The initial sale of Capstan ARCs occurred pursuant to the issuance of the Private Placement Memorandum, a document that describes the terms of the Capstan ARCs and of the auction processes. Several provisions of the Capstan ARC PPM are relevant to the present motion.

3

On the first page, in italics, the PPM states, *"There can be no assurance that upon early liquidation of the Series the Holders will have received distributions equal to the original purchase price of their certificates."* On the following page, in bold and full capitalization, the PPM states, **"THE CERTIFICATES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED . . . AND NEITHER THE TRUST NOR THE SERIES HAS BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED."**

On numbered page 9, beneath the heading "Risks Associated with the CLCs," is written the following: "The Holders are exposed to the credit of the CLCs. If losses are allocated to the CLCs in accordance with their terms, reducing their principal amount . . . then the principal repaid to the Holder could be less than the Holder's original investment." Declaration of Stephen L. Saxl in Support of Defendants' Motion to Dismiss the Third Amended Complaint ("Saxl Decl."), Ex. B. This warning is supplemented by one given on the next page, which provides: "The likelihood of a Holder being paid interest on and the principal of the Certificates will be highly dependent on the financial status of the reference entities to which the CLCs are credit linked. The creditworthiness of each Reference Entity may be affected by a variety of factors that are inherently difficult to predict, such as business, financial, market and legal uncertainties."

On numbered page 11, the PPM provides for DBSI's rights to participate in the auctions, and warns that it is not required to do so. First, the PPM provides, "[t]he Broker-Dealer may assist in resales of the Certificates, but it is not required to do so." Further, "[t]he Broker-Dealer may submit Orders in auctions for its own account. . . . If the Broker-Dealer

4

submits an Order for its own account in any Auction, it could have an advantage over other Potential or Existing Holders in that it would have knowledge of other Orders placed through it in that Auction." This page of the PPM also made clear that Capstan ARCs could only be sold at auction; no secondary markets were permitted to develop.

Finally, on numbered pages 13-14, in bold text, the PPM provides "[E]ach **prospective purchaser of the Certificates is urged to conduct its own independent investigation of the Reference Obligations and Reference Entities to which the CLCs are credit linked, and of the CLCs Issuer and not to rely upon the Series, the Broker-Dealer, the Initial Purchaser, the Auction Agent, the Counterparty or any affiliate thereof as a source of information concerning the Reference Obligations, the Reference Entities or the CLCs Issuer."**

### D. The Inherent Risk of Auction Rate Securities

Plaintiff, and like institutions, purchased auction rate securities to obtain a higher rate of return than was available in the market. But auction rate securities cannot be considered as "cash equivalents" or institutional debt equivalents. The interpositioning of special purpose vehicles as the issuers, and the quality of the security enabling such special purpose vehicles to honor the securities they offered, created risk beyond that available from normal purchases of securities. Furthermore, the discretion reserved by the underwriter charged with conducting the periodic auction market, whether to bid or not to bid, crated the risk that the market might not be supported in an unfavorable economic climate.

An SEC release published in March 2005, "Current Accounting and Disclosure Issues in the Division of Corporate Finance," made all this clear, as did other published materials. See http://www.sec.gov/divisions/corpfin/acctdis030405.htm#P514_81909; see also In

5

re UBS Auction Rate Sec. Litig., 08 Civ. 2967, 2010 WL 2541166, at *10-12 (S.D.N.Y. June 10, 2010) (McKenna, J.) (canvassing various news outlets); see also, e.g., Alison Bisbey Colter, "Auction-Rate Securities Under Fire – Amid Pressure, Companies Stop Grouping Investments," Wall St. J. Mar. 24, 2005; "Auction-Rate Securities: Hold that Gavel," CFO Magazine, Apr. 25, 2005.

### E. Collapse of the ARS Market

Over the summer of 2007, the credit market deteriorated and various securities backed by subprime mortgages experienced credit events. On August 20, 2007, DBSI held the first auction for Capstan ARCs. Plaintiff alleges that although DBSI had previously routinely placed support bids for Camber and Pivot ARCs, it did not place a support bid on the Capstan ARCs, and the auction failed. Plaintiff was unable to sell its Capstan ARCs, and was unable to recover the par value based on the maximum rate provided in the PPM, 50 points over LIBOR. On December 18, 2009, Plaintiff tendered its Capstan ARCs to DBAG, which exercised its right under the offering documents and disclosed in the PPM to repurchase them at 50 cents on the dollar and unwind the transaction, including the obligations provided in the underlying synthetic credit default swaps.

### F. Procedural History

Previously, I dismissed Plaintiff's complaint. On March 23, 2010, following oral argument on Defendants' motion to dismiss Plaintiff's Second Amended Complaint,[4] holding that Plaintiff had failed to plead a cause of action under §§ 10(b) and 20(a) of the SEA because it had failed to plead, with requisite particularity, a claim of market manipulation. Oral Argument

---

[4] The prior amendment to the complaint changed the lead Plaintiff. The Second Amended Complaint also changed the lead plaintiff to Pivot Point, and Defendants thereafter filed their first motion to dismiss.

6

at *17-19, Pivot Point Capital Master v. Deutsche Bank AG, 08 Civ. 2788 (S.D.N.Y. March 23, 2010). Plaintiff filed the TAC on April 23, 1010, and Defendants now move to dismiss.

**II. Standard of Review**

On a motion to dismiss, the district court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). The district court is entitled to consider the complaint, statements or documents incorporated into the complaint, any statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing suit. Slayton v. Am. Exp. Co., 604 F.3d 758, 763 n.2 (2d Cir. 2010); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949. In making this determination, the district court is free to disregard legal conclusions and conclusory statements that the plaintiff has been harmed." Id. at 1950.

In addition, Plaintiffs pleading claims of securities fraud must meet the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Under Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.2000). Allegations that

7

are conclusory or unsupported by factual assertions are insufficient. See Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir.1986). Under the PSLRA, where the plaintiff alleges misleading statements or omissions, the plaintiff must set forth each statement "alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, in a case such as this, the plaintiff must plead facts showing scienter with particularity, setting forth "with respect to each act or omission alleged," facts giving rise "to a strong inference that the defendant acted with the required state of mind." Id. § b(2); see generally, ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98-99 (2d Cir. 2007).

### III. Discussion

Plaintiff alleges it purchased Capstan ARCs on the misperception that they were a safe cash equivalent that existed in a liquid market; that DBSI and DBAG created the misperception by placing support bids on other ARCs issued by DBSI; and that DBSI allowed the Capstan ARC auction to fail as a means of unloading an undesirable debt obligation contained in the Capstan ARCs. The gravamen of the complaint is that Plaintiff believed the auctions were driven by "natural forces of supply and demand, rather than by and in ignorance of Defendants' manipulative conduct." In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009) (Swain, J.).

A necessary element of a market manipulation claim is "damage . . . caused by reliance on an assumption of an efficient market free of manipulation." ATSI Commc'ns, 493 F.3d at 101. This element is common to claims under Rules 10b-5(a), (b), and (c). Slayton, 604 F.3d at 765; ATSI Commc'ns, 493 F.3d at 101. To make out this element, Plaintiffs must allege

8

Case 1:10-cv-10254-JLT Document 39 Filed 01/07/11 Page 12 of 15
Case 1:08-cv-02788-AKH Document 80 Filed 12/09/10 Page 9 of 12

facts showing "reliance on the integrity of the market (i.e., that they believed it was not manipulated.") (emphasis in original). In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003). The general rule is that the reliance must be reasonable. Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir. 1996). The evaluation of reliance is holistic, taking into account the transaction's complexity and magnitude, the parties' sophistication, and the content of the agreements. In re Merrill Lynch Auction Rate Sec. Litig., 09 MD 2030, 2010 WL 1257597, at *13 (S.D.N.Y. Mar. 31, 2010) (Preska, C.J.). Plaintiffs cannot plead reasonable reliance if "through minimal diligence, the [plaintiff] should have discovered the truth." Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993); In re UBS Auction Rate Sec. Litig., 2010 WL 2541166, at *22. For several reasons, Plaintiff's TAC is insufficient to make out the necessary reliance.

First and foremost, Plaintiff's claim that it believed Capstan ARCs were safe "cash equivalents" is facially implausible and insufficient to support its claim. Iqbal, 129 S. Ct. at 1949-50. The ARCs comprised a portfolio of 125 synthetic credit default swaps, 20 percent of which referenced subprime-mortgage backed securities. The very idea of reasonable reliance on an efficient market for such a unique offering, in an auction environment, is not credible—particularly when, as here, the purchaser is a sophisticated investor.

Second, DBSI disclosed all the material facts regarding the auction process in the PPM. In the face of full disclosure regarding how an auction process would actually proceed, a plaintiff cannot reasonably plead reliance on an assumption that it would operate in some other fashion. In re UBS Auction Rate Sec. Litig., 2010 WL 2541166, at *18; In re Merrill Lynch Auction Rate Sec. Litig., 2010 WL 1257597, at *13; In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d 294, 306-07 (S.D.N.Y. 2009). Here, the PPM disclosed quite clearly the risky

nature of the securities that Plaintiff had purchased, as well the absence of obligation by DBSI, the broker-dealer, to secure auction successes. Without a firm obligation to support the auctions, Plaintiff could have no assurance that it had purchased securities with firm value, and the PPM made clear that DBSI did not have a firm obligation. Indeed, the PPM made clear that upon early liquidation, Plaintiff could end up receiving far less than par value – another clear notice that Plaintiff had nothing like a "cash equivalent."[5] In view of this clear representation, Plaintiff cannot reasonably rely on an assumption that the market for Capstan ARCs would remain liquid regardless of DBSI's bids, or that DBSI would act as a good Samaritan and secure auction successes purely for others' welfare.

Third, through minimal diligence, Plaintiff would have understood the risks associated with taking on exposure to credit default swaps as a derivative for mortgage-backed securities, including subprime mortgage-backed securities. Brown, 991 F.2d at 1032. The PPM clearly disclosed to Plaintiff that the value of Capstan ARCs was tied to the creditworthiness of the portfolio of underlying corporate debt instruments, and that the ARC holder might not recover par value if elements of the portfolio experienced credit events. Plaintiff acknowledges that 20 percent of the portfolio comprised synthetic credit default swaps that referenced subprime mortgage-backed securities. The PPM also made clear that neither DBSI or DBAG was representing the quality of the portfolio, and that investors should undertake an independent evaluation before purchasing Capstan ARCs. Moreover, Plaintiff is among a select group of "Qualified Institutional Buyers," and cannot claim a lack of sophistication in these sorts of

---

[5] Plaintiff attempts to support its theory with a supplementary allegation that DBSI offered Capstan ARCs with a maximum rate far below the rate for the subprime-mortgage backed securities contained in the ARCs. Plaintiffs contend the low maximum rate gave a false impression that the Capstan ARCs were valued "AAA" and denied them the opportunity to recover par value after the auction failed. This argument is similarly implausible: DBSI disclosed the available maximum rate for Capstan ARCs, which contained a broad array of securities, including the specific ones Plaintiffs reference.

10

financial transactions, particularly in light of the abundant public information available regarding their risk. Multiple news outlets, as well as the SEC, made the market aware that Auction Rate Certificates carried certain risks associated with having a single broker-dealer for the auctions. Plaintiff, a sophisticated investor, cannot possibly claim a lack of awareness.

Notwithstanding the clear disclosures of the PPM and the relevant public information, Plaintiff contends it is entitled to a presumption of reasonable reliance, for two unpersuasive reasons. First, Plaintiff contends it is entitled to a presumption of reliance under the Supreme Court case of Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972). Assuming that the presumption under Affiliated Ute would apply to the full range of Plaintiff's claim, the full disclosure of DBSI's ability to intervene in Capstan ARC auctions belies any presumption of a fully efficient market. See In re Merrill Lynch Auction Rate Sec. Litig., 2010 WL 1257597, at *17 (holding that Merrill Lynch's disclosures of its ability to intervene in the ARS market to prevent auction failures and set clearing rates rebuts "any presumption of reliance on an assumption of the efficiency of the ARS market."). Plaintiff also contends it is entitled to a "fraud created the market" presumption of reliance. But as was noted in In re Refco, Inc. Sec. Litig., 609 F. Supp. 2d 304 (S.D.N.Y. 2009),

> whatever its merits (and those merits appear to be in grave doubt after Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008)), courts that apply the presumption appear to agree that that the touchstone of this standard is "unmarketability." Such "unmarketability" must mean either economic umarketability, which occurs when a security is patently worthless, or legal unmarketability, which occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security.

Id. at 318 (internal citations omitted). Neither economic or legal unmarketability is present here, for Plaintiffs concede they were able to sell their ARCs to DBAG at 50 cents on the dollar, and

11

there is no suggestion that the auctions to sell ARCs are forbidden. Indeed, as was recently noted, ARC auctions occurred successfully for twenty years prior to the meltdown of the credit markets. In re UBS Auction Rate Sec. Litig., 2010 WL 2541166, at 28. Plaintiff is not entitled to any presumptions, and cannot plead facts to show a reasonable reliance. Count One is therefore dismissed.

Count Two alleges that DBAG is liable under § 20(a) of the SEA, 15 U.S.C. § 78t(a). Such liability, dubbed "control person liability," is premised upon pleading a "primary violation of securities law." Pacific Inv. Mgmt Co. LLC v. Mayer Brown LLP, 603 F.3d 144, 160 (2d Cir. 2010). Plaintiff's failure to allege a claim against DBSI is fatal to this claim. Count Two also is dismissed.

### IV. Conclusion

It is unnecessary to consider the other arguments advanced by Defendants. I grant Defendants' motion and order the complaint dismissed with prejudice. The Clerk shall mark the motion (Doc. No. 71) terminated and issue judgment of dismissal, with prejudice and without costs, thus closing the case. The oral argument previously scheduled for December 15, 2010, is cancelled.

SO ORDERED.

Dated: December 9, 2010
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

12