UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AKAMAI TECHNOLOGIES, INC. and
AKAMAI SECURITIES CORPORATION,

      Plaintiffs,

v.

DEUTSCHE BANK AG,

      Defendant.

Civil Action No.  1:10 CV 10254 - JLT

## DEFENDANT DEUTSCHE BANK AG'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26(b)(2) and 26(c), defendant Deutsche Bank AG ("Defendant" or "Deutsche Bank AG") submits the following memorandum of law in support of its Motion for a Protective Order to preclude the depositions of current and former high-level officers and executives of Deutsche Bank AG and its subsidiary, non-party Deutsche Bank Securities Inc. ("DBSI") (collectively, for the purposes of ease of reference in this motion only, "Deutsche Bank") by Plaintiffs Akamai Technologies, Inc. and Akamai Securities Corporation (collectively "Plaintiffs" or "Akamai").

### Preliminary Statement

On July 28, 2011, under the guise of a "meet and confer" on discovery, Akamai informed Deutsche Bank AG for the first time that it would seek to amend its deponent list to depose eight entirely new witnesses, including: Josef Ackermann, Deutsche Bank's Chief Executive Officer; Thomas Bowers, Deutsche Bank's Head of Private Wealth Management; Michael Burke, Deutsche Bank's Head of U.S. Private Client Services; Bill Broeksmit, Deutsche Bank's Head of Portfolio Risk Optimization; and Rajeev Misra, Deutsche Bank's former Global Head of Credit

Trading, Securitization, and Commodities (collectively, the "DB Officers").[1]  Despite having

been informed by Defendant's counsel that none of the DB Officers have any direct or personal

knowledge of the facts or events in this case, and notwithstanding that Akamai has made no

effort to pursue a less burdensome or disruptive means of obtaining the information it purports to

seek by, for example, requesting Rule 30(b)(6) notices, or first deposing lower-level employees

or supervisors at Deutsche Bank, Akamai has chosen to proceed with its improper attempt to

depose the DB Officers.   Significantly, none of the eight proposed deponents appear on

Akamai's deponent list or in the Court's April 12, 2011 Scheduling Order (the "Order").

Moreover, at no time in the three months that passed between the issuance of the Court's Order

and Akamai's July 28th correspondence did Akamai ever indicate to Defendant that it would

seek to depose additional witnesses in this case, much less five "apex" DB Officers, including

Defendant's CEO.

Based on Akamai's July 28th representations, Akamai will claim that it requires the

proposed depositions of DB Officers as a result of purported "new discovery" from its

concurrent FINRA arbitration against DBSI (the "FINRA Arbitration").   This assertion is

baseless.   In fact, Akamai has possessed this "new discovery" for months.   Indeed, DBSI

produced over 5.9 million pages of documents in the FINRA Arbitration between August 2010

and May 2011.   Moreover, Akamai participated in two weeks of arbitration hearings in June

during which it relied upon this discovery in its arguments to the FINRA Panel.   Akamai has

refused to disclose what specific testimony or documents are the supposed "new discovery" that

leads it to believe that all of the relevant witnesses with relevant knowledge have not been

---

[1]       The other four witnesses Akamai now seeks to depose are:  Richard D'Albert, Deutsche Bank's former
Global Head of Structured Products; Andrew Peisch, Deutsche Bank's former Head of Banking and Origination;
Michael Jordan, Managing Director of Deutsche Bank's Institutional Client Group; and Susanna Chan, the head
trader of auction rate securities during the relevant period.

disclosed.  Further, Akamai inexplicably chose to wait until July 28th to inform Defendant of its purported need to take additional depositions of high-level Deutsche Bank executives in this matter based on such supposed "new" discovery.

Contrary to its assertions, Akamai does not truly require the depositions of the DB Officers, who have no relevant knowledge regarding the facts in this case.  Rather, Akamai's obvious purpose is one of harassment.  This is made clear by the aggressive and bullying manner in which Akamai demanded Defendant's consent to the proposed depositions.  Instead of seeking Defendant's consent to a joint motion to the Court for a mutual amendment of the parties' respective deponent lists,[2] Akamai aggressively overreached in the witnesses it sought to depose and demanded that Defendant consent to all of its requested depositions with no demonstration of relevance or necessity.  As if this were not enough, Akamai then brazenly demanded as part of its deposition request that Defendant consent to the imposition of an adverse inference against itself on certain discovery pertaining to CIB, DBSI's corporate investment banking division.

This is Akamai's version of a "meet and confer" on discovery.  Under the circumstances, Defendant has no choice but to seek a protective order to prevent Akamai from pursuing a series of harassing and disruptive depositions of high level DB Officers, none of whom directly supervised any of the DBSI traders of student loan auction rate securities ("SLARS") at issue in this case, and none of whom have any relevant knowledge of the allegations asserted in Akamai's Complaint.

As shown below, a protective order preventing the depositions of the DB Officers should issue pursuant to the well-established "apex doctrine," under which Akamai is not entitled to depose the DB Officers unless it can meet a heightened burden by showing that each of the

---

[2]    Defendant also seeks to amend its deponent list to include three new Akamai witnesses.  Akamai did not disclose these three witnesses in its Initial Disclosures.

proposed deponents has "unique personal knowledge" concerning the case that is neither available from other deponents nor obtainable from Deutsche Bank or the apex employees through less burdensome means of discovery such as depositions of lower-level employees.

For the reasons set forth below, Akamai does not come close to meeting this heightened standard.  It has failed to demonstrate any actual need for the depositions of the high-level DB Officers, or that such discovery is reasonably calculated to lead to admissible evidence.  Nor has Akamai made any showing that the DB Officers have knowledge -- unique, personal, or otherwise -- regarding the facts of this case.   Indeed, during a telephonic conference on August 1, 2011, Akamai flatly refused to tell Defendant why it purportedly requires the depositions of these five high-level corporate officials. Akamai's conduct falls well short of its "meet and confer" obligations in this case and speaks volumes about its true purpose in seeking depositions of the DB Officers.  Its relentless pursuit of the depositions at issue without any asserted basis for seeking them can only be viewed as precisely the type of harassment and abusive conduct that the "apex doctrine" and Rule 26(c) were designed to prevent.  Defendant therefore has no choice but to seek a protective order from this Court.

## BACKGROUND

### A.      Overview of the Litigation

Akamai's claims in this action arise out of their purchases of auction rate securities ("ARS") through Deutsche Bank AG's subsidiary, DBSI, which acted as Plaintiffs' broker. In early 2008, the global financial crisis eroded investors' demand for ARS.  Although broker-dealers historically had bid for their own accounts in auction for ARS they underwrote and for which they served as lead manager, in mid-February 2008, due to the credit crisis, the major broker-dealers stopped submitting "support" bids in ARS auctions, and there were widespread

auction                                                                    failures.
(*See* Plaintiffs' Complaint ("Compl.") ¶ 5.)   This left many investors like Akamai unable to liquidate their ARS holdings, though still receiving, even today, interest at the rate set forth in the offering documents for each ARS.  (*See* Compl. ¶ 21.)

On February 12, 2010, Akamai commenced this lawsuit against Deutsche Bank AG, the ultimate corporate parent of non-party DBSI. (Compl. ¶ 1.)  Akamai does not allege when it bought or sold any ARS during the period from November 2005 (when it opened its account) until February 2008 (when the ARS market collapsed); it merely alleges that it deposited $100 million in November 2005, and that it "continued to invest additional operating profits with DBSI, and the balance in the account frequently exceeded $200 million." (Compl. ¶ 13.)

Akamai alleges no direct dealings, contract, or customer relationship with Deutsche Bank AG.  (*See* Compl. ¶¶ 39-43.)  Akamai admits that it was a client of DBSI, not Defendant, and that DBSI was the FINRA member broker/dealer through which it made the investments in the student loan auction rate securities ("SLARS") at issue. (Compl. ¶¶ 1 at n.1, 2, 13, 24.)  Plaintiffs seek to hold DBAG vicariously liable for an alleged fraud by DBSI based on purported "control person" violations of (1) Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, and (2) Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. 110A § 410(b).

**B.**     **The Court's April 12th Order**

On April 12, 2011, following the parties' respective initial disclosures and a Scheduling Conference with the Court, the Court issued a Scheduling Order directing, among other things, that Plaintiffs could take the depositions of the following individuals:  Kevin Lynch, Jonathan DeFreytas, Susanna Chan, Hardy Manges, Andres Ponce, Con Accibal, Paul Vambutas, and "one

or more officers, directors, employees, or agents of [Deutsche Bank AG] . . . with knowledge concerning the exercise of control by [Deutsche Bank AG] over [DBSI]" for purposes of Plaintiffs' control person claims under Section 20(a) and Section 410(b).[3]  (*See* Ex. A to the Soli Decl.)  The Court's April 12th Order states that "[n]o further discovery is permitted without leave of this court." (*Id.*)  The Court subsequently set a deadline of September 13, 2011, for the completion of depositions.  (*Id.*)

C.     **Akamai Demands That Defendant Consent To Additional Depositions Of Senior Deutsche Bank Officers And An Adverse Inference Regarding Contested Discovery**

Under the guise of pursuing a "meet and confer" on discovery, Akamai wrote to Defendant on July 22, 2011, to assert baseless allegations of discovery violations and draconian "take it or leave it" discovery demands it knew were unacceptable to Deutsche Bank AG.[4] (*See* Ex. B to the Soli Decl.)  First, Akamai accused Defendant of failing to identify certain individuals with discoverable information in its Initial Disclosures. (*Id.*)  It then alleged that Deutsche Bank AG made misrepresentations to the Court regarding a "Chinese Wall" surrounding CIB, DBSI's investment banking division.  (*Id.*)

Based on these distorted claims, and under threat of a motion to the Court in which it would seek adverse inferences and attorneys fees, Akamai demanded that Deutsche Bank AG consent to the following: (1) an amendment of Akamai's list of deponents to include an unspecified number of purportedly "newly discovered individuals" whom it failed to name or identify[5]; (2) an amendment of Defendant's own disclosures with the names of all outstanding

---

[3]      True and correct copies of the Court's Orders dated April 12 and 13, 2011 are annexed as Exhibit A to the Declaration of Toby S. Soli, dated August 1, 2011 (the "Soli Decl.").

[4]      True and correct copies of emails dated July 22, 26, 28, and 29, 2011 between Michael Ross and Toby Soli are annexed as Ex. B to the Soli Decl.

[5]      As these individuals were allegedly "newly discovered," Akamai presumably could have identified them in its initial email to Defendant but chose not to do so.

individuals with discoverable information whom Defendant allegedly had failed to disclose (and consent to Akamai's amending its list of deponents to include these unidentified individuals); and (3) an "adverse inference" against Deutsche Bank AG that certain contested discovery in the FINRA Arbitration "contained adverse evidence showing DBSI's undisclosed knowledge of the risks of auction rate securities." *Id*.

In response, Deutsche Bank AG denied Akamai's allegations of discovery violations and flatly rejected Akamai's outlandish request for an adverse inference, which lacked any basis. Defendant did agree, however, to consider a consensual amendment of the parties' respective list of deponents based on discovery taken in the FINRA Arbitration, which the parties had agreed would be deemed produced in this action, as well as testimony taken in the FINRA Arbitration.[6] (*See* Ex. B to the Soli Decl.)  Defendant asked Akamai to provide it with a proposed amended list of deponents for consideration.  (*Id*.)

On July 28, 2011, Akamai finally provided the names of eight additional employees it sought to depose "based on the documents and testimony in the FINRA [A]rbitration": Josef Ackermann, Deutsche Bank's CEO; Thomas Bowers, Deutsche Bank's Head of Private Wealth Management; Bill Broeksmit, Deutsche Bank's Head of Portfolio Risk Optimization; Rajeev Misra, Deutsche Bank's former Global Head of Credit Trading, Securitization, and Commodities; Michael Burke, Deutsche Bank's Head of U.S. Private Client Services; Richard D'Albert, Deutsche Bank's former Global Head of Structured Products; Andrew Peisch, Deutsche Bank's former Head of Banking and Origination; and Michael Jordan, Managing Director of Deutsche Bank's Institutional Client Group.  The only witness Akamai sought to depose from its original list was Susanna Chan, the head ARS trader.  (*Id*.)

---

[6]     The FINRA Arbitration commenced on June 7, 2011 and continued on June 8-10 and June 14-17. Additional hearing dates are scheduled for November 7, 9, and 10, and December 5-8, 12, 16, 19, and 20, 2011.

On August 1, 2011, counsel for the parties held a meet and confer during which the parties discussed Akamai's request to amend its deponent list to include depositions of entirely new witnesses, including the five DB Officers.  Deutsche Bank AG objected to the depositions of the five DB Officers, but offered that it would not object to Akamai's request to amend the list of deponents to include Richard D'Albert, Andrew Peisch, and Michael Jordan (in addition to Susanna Chan, which Defendant had already agreed to), if Akamai reciprocated by not objecting to Defendants request to amend its deponent list to include three new Akamai witnesses (Frederic Salerno, Jill Greenthal, and Marty Coyne).  Deutsche Bank AG expressly requested that Akamai withdraw its demand (made under threat of adverse inferences and attorneys fees) to depose the five DB Officers.  Akamai refused.  Deutsche Bank AG again explained that, separate and apart from the other deponents and discovery issues between the parties, the five DB Officers were not proper deponents and that Akamai had not carried its burden to show that any of them had any relevant knowledge, much less unique personal knowledge.  Shockingly, when Defendant asked Akamai to provide any basis whatsoever for its request for the deposition of any one of these five high-level officers, Akamai flatly refused to do so.  Given Akamai's intransigence in the face of a reasonable offer on the part of Deutsche Bank AG and wholesale refusal to provide any justification for its baseless request to take the depositions of the DB Officers, Deutsche Bank AG had no choice but to seek a protective order from this Court.

## ARGUMENT

**I.      The  "Apex Doctrine" Protects A Senior Corporate Officer From Being
         Deposed When He Or She Has No Unique Personal Knowledge Of The
         Matters At Issue And Adequate Discovery Can Be Obtained Through Other Means.**

Pursuant to Rules 26(b)(2)(C) and 26(c) of the Federal Rules of Civil Procedure, this Court has broad discretion to issue a protective order to limit inappropriate discovery.

*See* Fed. R. Civ. P. 26(b)(2)(C) and 26(c) (2011). *See Bogan v. City of Boston*, 489 F.3d 417, 423

(1st Cir. 2007) ("The district court is empowered by Fed. R. Civ. P. 26(c) to grant a protective

order for 'good cause shown.'"); *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 532 (1st Cir. 1993)

(recognizing that Rule 26(c) "generously permits 'for good cause shown' the making of 'any

order which justice requires' to protect against annoyance, embarrassment or undue burden

occasioned by discovery") (quoting Rule 26(c)).   This inherent authority is particularly crucial

in this case, where Akamai seeks to depose current and former executives at the highest level or

"apex" of Deutsche Bank.   Courts routinely protect high-level corporate officials from being

deposed in a lawsuit against the corporation where two conditions are met:

> (1)  the executive has no unique personal knowledge that is relevant to the case;[7] and
>
> (2)  the party seeking the deposition failed to try to obtain the information sought by other less burdensome means.

*See Serrano v. Cintas Corp.*, Nos. 04-40132, 0612311, 2010 WL 2490775, at *2 (E.D.  Mich.

June 10, 2010) (preventing deposition of CEO under "well recognized doctrine" requiring

showing of "unique personal knowledge"); *Little League Baseball, Inc. v. Kaplan*, No. 08-cv-

60554, 2009 WL 426277, at *3 (S.D. Fla. Feb. 20, 2009) (denying motion to compel deposition

where apex witness had "only a second-hand knowledge of [the] events based on his discussions

with other [company] employees"); *Celerity, Inc. v. Ultra Clean Hldg., Inc.*, No. 05-CV-4374,

---

[7]      It is not sufficient merely to establish that the high-level executive has *some* knowledge of the involved events -- rather, it is required that the individual's knowledge of the relevant facts be *unique*. *See, e.g., Celerity*, 2007 WL 205067, at *4 (noting that "unique" personal knowledge "is an essential component of the standard for an apex deposition"); *see also Community Federal Sav. & Loan Ass'n v. FHLBB*, 96 F.R.D. at 621-22 (D.D.C. 1983) (plaintiff could not depose high level administrators without first demonstrating that administrators possessed "unique personal knowledge" that could not be obtained through deposition of company-designated spokesperson); *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 179 (Tex. 2000) (emphasizing that if "some knowledge" were enough, the apex deposition guidelines "would be meaningless" and "virtually indistinguishable from the scope of general discovery."); *M.A. Porazzi Co. v. The Mormaclark*, 16 F.R.D. 383 (S.D.N.Y. 1951) (high level executive may not be deposed if he could contribute nothing new to the information provided by the alternative deponents).

2007 WL 205067, at *4 (N.D. Cal. Jan. 25, 2007) ("This is an essential component of the standard for an apex deposition – unique personal knowledge by the high corporate official, <u>unavailable from less intrusive discovery, including interrogatories and the depositions of lower-level employees</u>.") (emphasis added); *Elvig v. Nintendo of Am., Inc.*, No. 08-cv-02616, 2009 WL 2399930, at *2 (D. Colo. July 31, 2009) ("[W]here a party seeks to depose a high level executive typically removed from the daily subjects of the matter in litigation, the party seeking discovery must first demonstrate that the proposed deponent has 'unique personal knowledge' of the matters in issue."); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991) (recognizing that discovery restrictions are appropriate when the discovery sought "is obtainable from some other source that is more convenient, less burdensome, or less expensive.").

This protection – sometimes called the "apex doctrine" – reflects the judgment of "[v]irtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management . . . that such discovery creates a tremendous potential for abuse or harassment." *Celerity, Inc.*, 2007 WL 205067, at *3. It also recognizes the reality that major corporations are constantly involved in litigation, making it unreasonable for their CEOs and high-level executives to be deposed in every case in which their supervisory role has given them limited knowledge regarding matters relevant to the case, but not "unique" or "personal" knowledge that opposing parties can obtain from other sources. *See El Camino Res., Ltd. v. Huntington Nat'l Bank*, No. 1:07-cv-598, 2008 WL 4833009, at *3 (W.D. Mich. Nov. 5, 2008).

Under the apex doctrine, when a high-ranking official of a corporation does not have any direct knowledge of the facts, "it is inappropriate to compel his deposition without first deposing lesser-ranking employees who have more direct knowledge of the facts at issue." *See Little*

*League Baseball, Inc.*, 2009 WL 426277, at *3. Federal courts have imposed this limitation based on the concern that litigants may be tempted to use the depositions of senior officers and executives (and the disruption they may cause) as a form of leverage or harassment. *See Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D. R.I. 1985) (recognizing potential for harassment and rejecting plaintiffs' request for deposition of defendant Chrysler Chairman, Lee Iacocca, where Iacocca signed affidavit professing lack of knowledge regarding information sought by plaintiffs; directing plaintiffs to serve interrogatories prior to seeking deposition); *Treppel v. Biovail Corp.*, 2006 WL 468314, *1 (S.D.N.Y. Feb. 28, 2007) ("[P]ermitting unlimited access to corporate executives could disrupt their businesses and create a tool for harassment."); *General Star Indem. Co. v. Platinum Indemnity Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002) ("In deciding whether to permit the deposition of a corporate executive, a court must examine the possibility of harassment and the potential disruption of business.").

Where a party seeking to take the deposition of an "apex" executive fails to satisfy the two elements set forth above, federal courts of appeal have not hesitated to affirm the issuance of protective orders denying the requested deposition. *See*, *e.g.*, *Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995) (upholding protective order barring deposition of IBM's chairman where plaintiff made no attempt to demonstrate that information sought from apex executive could not be gathered from other personnel); *Lewelling v. Farmers Ins.*, 879 F.2d 212, 218 (6th Cir. 1989) (affirming protective order where chairman and C.E.O. lacked personal knowledge); *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) (upholding protective order barring deposition of company president because he lacked direct knowledge of facts in dispute, and other employees had more direct knowledge); *cf. Bogan v. City of Boston*, 489 F.3d 417, 424 (1st Cir. 2007)

(affirming district court's protective order preventing deposition of high government official where plaintiffs "had not exhausted other available avenues of discovery").

As shown below, Akamai does not come close to meeting this heightened standard.  Its request for the depositions of the DB Officers should therefore be denied.

## II.     The DB Officers Are Apex Witnesses Who Lack The Requisite Unique Personal Knowledge to Be Deposed

A court's authority to prevent depositions of "apex witnesses" who lack unique personal knowledge of the relevant matters in a litigation derives from its broad authority under Federal Rule of Civil Procedure 26(b)(2) to limit discovery when "the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i); *see Little League Baseball, Inc.*, 2009 WL 426277, at *2 (applying apex doctrine under authority provided by Fed. R. Civ. P. 26(b)(2).

Here, the requested depositions of the DB Officers should be precluded, first and foremost, because none of these proposed deponents possess unique or superior personal knowledge relevant to this case.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i); *Serrano*, 2010 WL 2490775, at *2; *Little League Baseball, Inc.*, 2009 WL 426277, at *3; *Celerity, Inc.*, 2007 WL 205067, at *4; *Elvig*, 2009 WL 2399930, at *2.  Indeed, not only has Akamai failed to carry its heightened burden, it has not even shown that any of the DB Officers have <u>any</u> knowledge whatsoever of the facts relevant to this case.  As referenced above, Mr. Ackermann is the CEO of Deutsche Bank – a position he has maintained since 2002. Because of Mr. Ackermann's high level position at Deutsche Bank, he does not directly supervise Deutsche Bank employees day-to-day, including traders in the SLARS at issue, or employees of CIB.  Moreover, he works and resides in Germany.  Mr. Ackermann was not named in the Complaint, not cited in Plaintiffs' Initial

Disclosures, and he was not involved in and he does not have any firsthand or personal knowledge of any of the events or facts out of which this action arose.

Similarly, as the Heads of Private Wealth Management, U.S. Private Client Services, and Portfolio Risk Optimization and the Global Head of Credit Trading, Securitization, and Commodities, respectively, Mr. Bowers, Mr. Burke, Mr. Broeksmit, and Mr. Misra did not directly supervise SLARS traders or relevant employees of CIB. At most, they are/were "supervisors of supervisors" and thus, possess no firsthand, much less unique or superior knowledge of the events that are alleged to have transpired in the Complaint. Like Mr. Ackermann, these individuals were not named in the Complaint or cited in Plaintiffs' Initial Disclosures. Moreover, they were not involved in and do not have any firsthand or personal knowledge of any of the events or facts out of which this action arose. And as with Mr. Ackermann, Akamai's claims in this case relate to knowledge of a narrow subject matter and involved supervisory authority well below the position and responsibilities of Mr. Bowers, Mr. Burke, Mr. Broeksmit, and Mr. Misra.

Tellingly, Akamai offers no cognizable legitimate justification for its attempt to leap-frog to the top of Deutsche Bank's corporate hierarchy and depose its current CEO (Mr. Ackermann), Head of Private Wealth Management (Mr. Bowers), Head of Portfolio Risk Optimization (Mr. Broeksmit), former Head of U.S. Private Client Services (Mr. Burke), and its former Global Head of Credit Trading, Securitization, and Commodities (Mr. Misra). Akamai fails to show that these individuals possess any personal knowledge – much less the required "unique personal" knowledge – regarding the matters at issue in this case.

Further, Akamai continues to refuse to identify precisely what information it hopes to obtain from these witnesses. Tellingly, in its July 28th email to Defendant, Akamai simply

stated in conclusory fashion that the DB Officers "have discoverable information."  (Ex. B to
Soli Decl.)   In addition, during its August 1st meet and confer with Defendant, Akamai
steadfastly refused to state why it purportedly requires the depositions of the DB Officers.
Indeed, when asked to articulate even a single reason why any one of the DB Officers were
believed to have relevant information, Akamai flatly refused to answer the question.  Under the
well-established Apex Doctrine, this is grossly insufficient to justify the disruptive burden the
requested depositions would cause to Deutsche Bank AG and the DB Officers.

For all of these reasons, the DB Officers should not be subject to a deposition in this case.
*See, e.g.*, *Serrano*, 2010 WL 2490775, at *2; *Little League Baseball, Inc.*, 2009 WL 426277, at
*3; *Celerity, Inc.*, 2007 WL 205067, at *4; *Elvig*, 2009 WL 2399930, at *2; *Reif v. CNA*, 248
F.R.D. 448, 453-54 (E.D. Pa. 2008) (granting protective order where plaintiffs failed to show
CEO "possessed any special or unique knowledge of [the matters at issue]").

### III.  Akamai Can Obtain Adequate Discovery From Other Knowledgeable Witnesses and Through Other Means.

Even if Akamai could demonstrate such unique personal knowledge (it cannot), its
demand for the proposed depositions should still be rejected because it clearly can obtain
adequate discovery from other, more knowledgeable witnesses and through less burdensome
means.  *See e.g. Reif v. CNA*, 248 F.R.D. 448, 454 (E.D. Pa. 2008) (requiring plaintiffs to
"demonstrate the insufficiency of interrogatories or the depositions of lower level employees
before obtaining a deposition of [the CEO]"); *Burns v. Bank of America*, No. 03 Civ. 1685, 2007
WL 1589437, *3-*4 (S.D.N.Y. June 4, 2007) (recognizing that plaintiffs should have "sought to
question lower level corporate officials with similar knowledge before asking [the] court to
compel the depositions of [higher level executives]"); *Baine*, 141 F.R.D. at 335 (noting that
discovery restrictions are appropriate when "the discovery sought is obtainable from some other

source that is more convenient, less burdensome or less expensive.") (internal citation omitted); *McMahon v. Presidential Airways, Inc.*, No. 6:05-cv-1002-Orl-28JGG, 2006 WL 5359797, *3 (M.D. Fla. Jan. 18, 2006) (denying motion to compel deposition of corporate president and CEO because, among other things, plaintiffs "failed to demonstrate . . . that the information cannot be obtained less intrusively").

Not only would lower ranking Deutsche Bank employees be more likely to have either the unique or superior knowledge regarding the matters at issue in this litigation, but Defendant already has identified those employees to Akamai. To date, Akamai has not taken the deposition of <u>any</u> of these individuals – including any DBSI ARS trader – before accusing Defendant of failing to disclose knowledgeable witnesses and before seeking to depose apex employees of Deutsche Bank. Nor has it served any Rule 30(b)(6) deposition notices or made any effort to show how the **<u>5.9 million pages</u>** of documents produced by DBSI in the FINRA Arbitration, as well as Defendant's recent agreement to search the files of 11 additional custodians are insufficient, such that it requires the proposed depositions of senior Deutsche Bank officials. At a bare minimum, ***before*** jumping to the very top of Deutsche Bank's corporate structure and harassing senior DB Officers who have no knowledge of the relevant facts in this case, Akamai should be required to exhaust other less burdensome discovery before pursuing these burdensome avenues of discovery. It also should be required to demonstrate that the depositions of the DB Officers are not cumulative or duplicative of other depositions or discovery that Akamai has taken, or seeks to take in this case.

As Akamai has failed to do any of the above, its attempt to seek the depositions of senior officers and executives of Deutsche Bank should be viewed for what it is: an exercise in harassment and discovery abuse of the type that the apex doctrine and Federal Rules 26(b)(2)(C)

and 26(c) were specifically intended to prevent.[8]  *See Six West Retail Acquisition, Inc. v. Sony Theater Mgmt. Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001) ("[T]he likelihood of harassment and business disruption are factors to be considered in deciding whether to allow discovery of corporate executives."); *Tri-Star Pics., Inc. v. Unger*, 171 F.R.D. 94, 102 (S.D.N.Y. 1997) ("When the discovery to be obtained is through the deposition of a senior executive, a court must remain mindful that "permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation."); *Armstrong Cork Co. v. Niagara Mohawk Power Corp.*, 16 F.R.D. 389, 390-91 (S.D.N.Y. 1954) ("The court should be alert to see that the liberal deposition procedure provided in the Federal Rules is used only for the purpose for which it is intended and not used as a litigation tactic to harass the other side or cause it wasteful expense.")

For these reasons, a protective order is required and should be issued.

## IV.   The Burden and Disruption to Defendant and the DB Officers Far Outweighs Any Purported "Benefit" That Would Result From the Proposed Depositions.

Finally, the Court should deny the requested depositions pursuant to Federal Rule 26(b)(2)(C)(iii) because the "burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 26(b)(2)(C)(iii) (2011).  Plainly, the demands of running a large,

---

[8]      One commentator addressing the frequent and increasing abuse associated with apex depositions of senior corporate executives cogently summarized the harassment problem as follows:

> In an increasingly litigious society, the attempt to capriciously set depositions of high-ranking corporate executives, who are often referred to as "apex officials," has become commonplace. These executives rarely have personal knowledge of the facts and issues surrounding a given case, but litigants use broad-stroked claims against parent companies and lax discovery rules seemingly to harass executives and extort settlements through threats of -- and in many cases the actual taking of -- depositions from chief executive officers, chief operating officers, chief financial officers, or other apex executives. These litigants frequently know that the officers have little or no knowledge about the cases. However, they often successfully try to contort the typically liberal discovery rules in a manner that allows these otherwise prohibited types of discovery.

*See* Curtailing Deposition Abuses of Senior Corporate Executives, 45 Judges' Journal 30 (Winter 2006) (emphasis added).

publicly-held, global company like Deutsche Bank are extensive.  As senior executives, Mr. Ackermann (CEO), Mr. Bowers (Head of Private Wealth Management), Michael Burke (former Head of U.S. Private Client Services), Mr. Broeksmit (Head of Portfolio Risk Optimization), and Mr. Misra (former Global Head of Credit Trading, Securitization, and Commodities) have many burdens placed on their time and their availability is significantly limited. The disruption and intrusive nature of the requested discovery are compounded by the fact that Mr. Ackermann lives and resides in Germany and Mr. Broeksmit lives and resides in England.

The inevitable business disruption caused by requiring the DB Officers to sit for depositions in this case, in which they possess no unique or superior knowledge (indeed no knowledge at all) regarding relevant or material facts, would constitute a significant burden to Deutsche Bank and to these individuals personally, especially when – as here – facts and events relevant to the allegations in the Complaint -- not known to these individuals -- are plainly available through other less intrusive means, such as deposing subordinates who *do* possess relevant information, conducting 30(b)(6) depositions, and/or propounding other less burdensome discovery.

Under the circumstances, and in consideration of the absence of any relevant information that the DB Officers can offer on the matters at issue, the burden of the proposed discovery unquestionably outweighs any asserted benefit from these depositions.  Indeed, given the utter lack of relevant knowledge on the part of the DB Officers, their depositions would provide no conceivable "benefit" to Akamai other than the harassment of Defendant and senior executives. Issuance of a protective order is therefore appropriate and necessary.

**V.    Akamai's Demand For an Adverse Inference
        Against Defendant Is Baseless Gamesmanship**

During the April 12th Scheduling Conference before the Court, the parties expressly left
open the possibility that additional depositions might be required based on discovery produced in
the FINRA Arbitration.[9]  (*See* Ex. C to the Soli Decl.)  The Court indicated that in order to take
additional depositions, the parties would "need to file a motion . . . to have that person added to
the list."  (*Id.*)  As <u>both</u> parties seek additional depositions in this matter based on new discovery,
the most appropriate manner to obtain such relief would be a joint motion to the Court to amend
the parties' respective deponent lists.

As stated above, however, rather than pursue such a motion, Akamai accused Defendant
of discovery violations and misleading the Court and demanded Defendant's consent to an
overbroad and improper list of proposed deponents that included a number of senior DB
Officers.  Further, it demanded that Deutsche Bank AG consent to its ludicrous and utterly
baseless demand for an adverse inference regarding certain contested discovery produced in the
FINRA Arbitration.  But hostile threats and baseless allegations of discovery violations are not a
proper means for seeking an amendment of the parties' deponent lists.

Based on information learned by Deutsche Bank after the initial disclosures, Defendant
seeks to take three additional depositions of Akamai witnesses. These witnesses (Frederic
Salerno, Jill Greenthal, and Marty Coyne) were not disclosed in Akamai's Initial Disclosures, yet
Defendant has not accused Akamai of failing to disclose all relevant witnesses with knowledge
to Defendant or misleading the Court.  Defendant has not demanded Akamai's consent to an
adverse inference as part of a request to amend the parties' respective deponent lists.  Defendant
has not threatened Akamai with a motion to compel in which it would seek such an adverse

---

[9]    A true and correct copy of the transcript from the parties' April 12, 2011 Scheduling Conference with the
Court is annexed as Exhibit C to the Soli Decl.

inference, as well as its attorneys fees.   In other words, Defendant has not attempted to manufacture a discovery dispute where none exists.

Akamai has done all of the above, turning what should have been a simple procedural matter into a contrived discovery dispute.  While such scorched earth tactics and harassment are "par for the course" for Akamai in this action and the FINRA Arbitration, it is improper for Akamai to attempt to use such tactics yet again as a means of harassing Defendant and senior executives with disruptive depositions, when these individuals have no knowledge of any relevant facts and when Akamai has made no effort to pursue such discovery by less burdensome means.

## CONCLUSION

For all of the foregoing reasons, Defendant Deutsche Bank AG prays that this Court grant a protective order precluding the depositions of DB Officers Josef Ackermann, Thomas Bowers, Michael Burke, Bill Broeksmit, and Rajeev Misra and grant such other and further relief as the Court deems just and proper.

Dated: August 1, 2011                              GREENBERG TRAURIG, LLP


                                   By:    /s/ Toby S. Soli
                                          Stephen L. Saxl (admitted *pro hac vice*)
                                          Toby S. Soli (admitted *pro hac vice*)
                                          200 Park Avenue
                                          New York, New York 10166
                                          Tel.: (212) 801-9200
                                          Fax: (212) 801-6400
                                          saxls@gtlaw.com
                                          solit@gtlaw.com

                                          -and-

A. John Pappalardo, BBO #388760
Victor H. Polk, Jr., BBO #546099
GREENBERG TRAURIG, LLP
One International Place
Boston, MA  02110
Tel.: (617) 310-6000
Fax: (617) 310-6001
pappalardoj@gtlaw.com
polkv@gtlaw.com

*Attorneys for Defendant Deutsche Bank AG*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent via U.S. first class mail to those indicated as non-registered participants on August 1, 2011.

/s/ Toby S. Soli